## COLUMBIA–KNICKERBOCKER TRUST CO. v. ABBOT.

(Circuit Court of Appeals, First Circuit. December 20, 1917. On Petitions for Rehearing, March 7, 1918.)

Nos. 1210–1222.

1. TRIAL ⬡═2—CONSOLIDATION OF CAUSES—DISCRETION OF COURT.

A number of actions at law were brought by the same plaintiff to recover from the defendant in each case a balance due on a subscription to the stock of a corporation. Defendants brought cross-actions to recover in each case the sum paid on the same subscription. The ground of defense in the former actions and the basis of the cross-actions was that the subscriptions were obtained by fraudulent representations, and the alleged misrepresentations to the several subscribers, although made at different times and to different persons, were in substance the same. *Held*, that it was within the discretion of the court, under Rev. St. § 921 (Comp. St. 1916, § 1547), to order the cases tried together to the same jury.

2. CORPORATIONS ⬡═90(1)—EQUITABLE DEFENSES IN ACTION AT LAW.

In an action at law on a contract of subscription to the stock of a corporation, the defense that the subscription was obtained by fraud is open to defendant.

3. CORPORATIONS ⬡═90(6)—ACTION ON STOCK SUBSCRIPTION CONTRACTS—EVIDENCE.

In actions by a trust company to enforce subscriptions to the stock of a Cuban railroad company, to which plaintiff had lent money, taking the subscription contracts as security, a map prospectus used to induce the subscriptions *held* admissible in support of the defense that they were obtained by fraudulent representations, where it was shown that the railroad company was organized largely by plaintiffs' officers, who were officers and directors therein and the controlling force in its management, that plaintiff itself was a stockholder in the promotion company which made the subscription contracts, and that the prospectus was prepared with the knowledge and approval of its officers for use generally in the soliciting of subscriptions.

4. EVIDENCE ⬡═129(4)—SIMILAR FACTS—ACTION ON STOCK SUBSCRIPTION.

Where actions against a number of the subscribers were tried together, the testimony of each defendant as to representations made to him, which were substantially the same as made to all the others, was admissible as to the other subscriptions, as tending to show uniformity and such general use of such representations that plaintiff could not assert its ignorance of it as to any particular subscriber.

5. EVIDENCE ⬡═244(1)—ADMISSIONS—ACTION ON STOCK SUBSCRIPTION.

Statements, orally and in letters, made to defendants and others by officers of plaintiff and by one to whom they had given charge of their Cuban interests, and tending to show, not only that they had knowledge of the prospectus and its use in obtaining subscriptions, but also that the railroad was in fact an enterprise of plaintiff and controlled by it, *held* material and admissible in evidence.

6. EVIDENCE ⬡═81—FOREIGN LAW—PRESUMPTION.

The law of Cuba, where the mortgaged property was situated, being the law of a foreign country and having to be proved as a fact, there can be no presumption that it was the same as the law of the United States, which would justify false representations as to the standing of the mortgage, necessarily governed by the Cuban law.

7. JUDGMENT ⬡═707—CONCLUSIVENESS—PERSONS NOT PARTIES OR PRIVIES.

Subscribers to the bonds of a railroad company secured by a mortgage on property in Cuba, having repudiated their subscriptions and not being parties, are not concluded by decree of the federal court of the

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
247 F.—53

Southern District of New York in foreclosure proceedings, which declared the mortgage to be a first lien as represented, for, as the court did not have jurisdiction of the property, its decree was conclusive only on parties to the suit, notwithstanding the court had jurisdiction of the then trustee, representing the bondholders, and also of the guarantor railroad's creditors and stockholders.

8. CORPORATIONS ⬤⟹472—BONDS—MISREPRESENTATIONS.

In actions involving subscriptions for bonds secured by a mortgage of Cuban property, a representation that the mortgage was a first lien necessarily meant it would outrank adverse claims; so, where the subscribers relied on the falsity of the representation, evidence that no adverse claim had been asserted offered in rebuttal was properly excluded.

9. DEPOSITIONS ⬤⟹111(3)—SECONDARY EVIDENCE—WAIVER OF OBJECTION.

Where, on the taking of the deposition of an expert accountant, he produced the books of a corporation which were then in his custody, testified as to matters found therein, and made a tabulation therefrom, which was attached to his deposition, all without objection, the court properly overruled a motion, made at the trial, to exclude the deposition and tabulation, on the ground the books were the best evidence and were not produced.

10. TRIAL ⬤⟹29(2)—COMMENTS BY JUDGE ON EVIDENCE.

Comments made by the court on evidence introduced on the trial of a case held not prejudicial.

11. CORPORATIONS ⬤⟹90(7)—INSTRUCTIONS—ACTION TO ENFORCE STOCK SUBSCRIPTIONS.

Instructions given in actions by the transferee of stock subscription contracts to enforce such contracts, in which the defense was that the subscriptions were obtained by fraud, with knowledge of which plaintiff was chargeable, considered and approved.

On Petitions for Rehearing.

12. DEPOSITIONS ⬤⟹111(3)—WAIVER OF OBJECTION—STIPULATION.

Where an expert accountant, on the taking of his deposition, produced corporate books then in his custody, testified as to matters found therein, and made a tabulation therefrom, which was attached to his deposition, all without objection, a stipulation as to the reservation of objections does not warrant the exclusion of the deposition on trial, upon the ground that the books were not produced.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Separate actions by the Columbia-Knickerbocker Trust Company against Edwin H. Abbot, against Preston B. Keith, against John S. Ames, against Maria A. Evans, executrix, against George E. Keith, against Mary O. Cordingley, and against F. Lothrop Ames. Judgment for defendant in each case, and plaintiff brings error. Affirmed.

Actions by Edwin H. Abbot, by John S. Ames, by Preston B. Keith, by George E. Keith, by Mary O. Cordingley, and by F. Lothrop Ames against the Columbia-Knickerbocker Trust Company. Judgment for plaintiff in each case, and defendant brings error. Affirmed.

Robert M. Morse, of Boston, Mass., and Julien T. Davies, of New York City (John R. Lazenby, of Boston, Mass., and Harold C. McCollom, of New York City, on the brief), for plaintiff in error.

Moorfield Storey and R. G. Dodge, both of Boston, Mass. (E. H. Abbot, Jr., of Boston, Mass., on the brief), for defendants in error.

Before DODGE and BINGHAM, Circuit Judges, and ALDRICH, District Judge.

DODGE, Circuit Judge. Of the thirteen cases brought before us by these writs of error, seven are suits at law brought in the District Court by the Trust Company, here plaintiff in error, a New York corporation, against various defendants, Massachusetts citizens, here defendants in error. The remaining six cases are suits at law brought in the District Court by all but one of the defendants above referred to, against said company, in which it is here also plaintiff in error and they defendants in error.

All the above suits are based on written subscription agreements further described below. In each suit brought by the Trust Company it seeks to recover from the defendant, a subscriber, the amount of an unpaid subscription. In each suit brought as above against said company, the subscriber seeks to recover back from it an amount paid to it on account of a subscription made. Under one of the subscription agreements referred to no partial payment was made, and therefore no suit brought to recover back such payment. This was the subscription by Evans, upon which his estate is sued in No. 1213. The seven subscription agreements were signed by the various subscribers, here defendants in error, upon various dates in 1906 and 1907.

The parties to each said agreement were the subscriber and the Northeastern Cuba Development Company, a Maine corporation, hereinafter called Development Company.

In each, the subscriber agreed with said Development Company to buy bonds and stock to a specified amount, of the Northeastern Cuba Railroad Company, another Maine corporation, to pay at once a certain part of the stipulated price, and to pay the balance in installments to be called for as in the agreement provided.

In each, the subscriber agreed to make said payments to the Knickerbocker Trust Company, the name at the time of the company here plaintiff or defendant in error (hereinafter called Trust Company), to the credit of said Development Company.

In each it was agreed that said Development Company might, instead of calling for said balance, borrow the same for a year or more upon pledge of the agreement and all rights thereunder to the securities subscribed for; the subscriber guaranteeing, in that event, to the lender, payment to the amount of said unpaid balance with interest.

It is undisputed, in each suit, that the Development Company had borrowed from the Trust Company the unpaid balance of the subscription. The suits brought by said Trust Company are based upon the subscribers' above guaranties of payment to the lender.

The defense asserted against each suit brought by the Trust Company was, that the subscription had been obtained—

"by false and fraudulent representations made by the plaintiff (and by one H. W. Bennett to the knowledge of the plaintiff)."

And, after specifying said representations, that—

"the plaintiff was aware when said agreement is alleged to have been signed * * * that each such representation had been made and was false, and that if the defendant entered into said agreement he had been induced to do

so by said representations, and all the acts of the plaintiff alleged were performed with such knowledge."

The subscribers' suits against said Trust Company to recover back what they had paid to it under said agreements were based upon the same grounds.

[1] 1. Upon the subscribers' motion, the District Court ordered the thirteen cases tried together, to the same jury. This was done against objection on the Trust Company's part, which contends here that the order was erroneous. It was made, according to a memorandum accompanying it—

"in view of the extensive identity in issues and evidence between these cases, of the statement of counsel for the [subscribers] that the misrepresentations relied on are the same in all the cases, of the fact that the cases have been tried together before the auditor, and of the large saving in the time of the court which will be effected by trying the cases together before the jury."

Whether to make such an order or not was within the court's discretion. Rev. Stats. § 921 (Comp. St. 1916, § 1547); Mutual, etc., Co. v. Hillmon, 145 U. S. 285, 292, 12 Sup. Ct. 909, 36 L. Ed. 706. Although, as stated below, the seven subscription agreements were not identical in their terms, the differences between them appear to have been in matters of entirely subordinate importance upon the main issues to be determined. Although the alleged representations relied on by the subscribers, whether written or oral, did not appear by the evidence to have been made at the same time or place to all the subscribers, or to have been identical in their terms as made to each subscriber, the Trust Company fails to satisfy us that the differences between the several cases in these respects were such as made the order an abuse of discretion; and we are unable to hold that the District Court erred in making it. No case is found wherein a judgment has been reversed merely because issues so nearly alike as those presented in these cases were submitted to the same jury in one trial. The record shows that the trial lasted from November 19 to December 30, 1914. It is clear that seven separate trials, the evidence in each of which would have been so largely a repetition of that given by the same witnesses in the other cases, were to be avoided, in the public interest, if this could be done without unduly prejudicing the company's rights. We are unable to believe that it has suffered any material injustice merely in having to try the cases together, as had been done without objection before the auditor, instead of separately. Each of the six cross-actions by a subscriber would of course be properly tried together with the action brought against such subscriber.

[2] 2. At the trial, due execution of all the subscription agreements having been admitted, the Trust Company offered proof of the respective amounts loaned by it to the Development Company in accordance with the terms of said agreements. The amounts paid to the Trust Company on account of each subscription and the amounts due upon each said loan made by it thereon having then been agreed, the Company rested. In opening the subscribers' cases it was then stated that they proposed to show all the agreements to have been obtained upon the fraudulent representations set forth in the pleadings.

The Trust Company then moved for directed verdicts in its favor, on the ground that the subscribers' allegations regarding false and fraudulent representations presented equitable defenses not available to them because the court had no jurisdiction thereof. This motion was denied.

The Trust Company then moved to strike out that portion of the auditor's reports dealing with said alleged equitable defenses, which motion was also denied. The auditor's reports in each case had been filed July 21, 1914, and on September 16, 1914, the company had moved to recommit them with instructions to exclude all evidence on the issues of false and fraudulent representations. These motions had been overruled by the court October 19, 1914, on the ground that said representations were admissible in evidence.

The subscribers thereupon read the auditor's reports in all the thirteen cases, from which it appeared that he had found for the defendant in each suit brought by the Trust Company, and for the plaintiff in each suit brought against it to recover back what a subscriber had paid it; having found on the evidence that each subscriber had been induced to sign the agreement sued on by false and fraudulent representations as to the material facts made with the knowledge and acquiescence of the Trust Company, which was aware that they were not true.

In each of the seven cases wherein the Trust Company was plaintiff, its assignment of error 2 complains of the denial of its above motion to recommit said reports; its assignment 3, of the above refusal to direct verdicts in its favor; and its assignment 4, of the above refusal to strike out so much of said reports as dealt with said alleged equitable defenses. It is contended here that said defenses could be availed of by the subscribers only in suits in equity seeking cancellation of their agreements, and that the court had no jurisdiction to entertain them in suits at law upon said agreements—no fraud touching the execution of the instruments themselves being asserted.

Had said agreements been under seal, these contentions must have prevailed, at the time the above rulings were made, according to the rule then undoubtedly established as to sealed written agreements. George v. Tate, 102 U. S. 564, 26 L. Ed. 232. But none of the agreements were under seal, and although, upon the question whether or not the above rule applies in suits at law upon unsealed agreements, there has been conflict in the decisions of the inferior federal courts, we hold, in view of Insurance Co. v. Bailey, 13 Wall. 616, 20 L. Ed. 501, and Cable v. U. S. Light, etc., Co., 191 U. S. 288, 24 Sup. Ct. 74, 48 L. Ed. 188, that said equitable defenses were open to the subscribers in these cases. No decision by the Supreme Court requiring a contrary conclusion is found. Since these verdicts were rendered (December 30, 1914), but before the final judgments thereon were entered (March 20, 1916), which the Trust Company seeks to reverse by the writs of error now before us, an amendment to section 274 of the Judicial Code, enacted March 3, 1915 (38 Stats. 956, Comp. St. 1916, §§ 1251a, 1251b, 1251c), has expressly authorized the interposition of equitable defenses in all suits at law, and has thus abrogated the above-established rule, even in the case of suits at law upon sealed agreements. Whether or not this enactment can have direct application in these cases, we find

no error in the rulings complained of by the above assignments 2, 3 and 4 in the seven suits brought by the Trust Company.

In each of the six cases brought by subscribers against the Trust Company it has made no assignments of error corresponding to 2 and 3 above, but in assignments numbered 2 it complains of the refusal to strike out the part of the auditor's report dealing with the alleged equitable defenses. Strictly speaking, there were no equitable defenses in these cases; nor did the auditor's reports filed in them purport to deal with any. The declarations were on accounts annexed, under which evidence was, of course, admissible that the defendant had obtained from the plaintiffs the amount claimed by means of false and fraudulent representations; and the auditor's finding that it had been so obtained required him to find, as he did, for the plaintiffs. We find no error, therefore, in the rulings complained of by the assignments numbered 2 in these six cases.

Further assignments of error relating to the auditor's reports complain of the admission of reports supplementary thereto, filed October 14, 1914, in each of the seven suits against subscribers. No reference to these alleged errors is found in the briefs submitted for the Trust Company, and we regard the assignments referred to as waived. They seem to us obviously without merit.

[3] 3. The remaining assignments of error relate to matters of subsequent occurrence at the trial.

Following the introduction of the auditor's reports (including said supplementary reports), the subscribers offered certain "map prospectuses" referred to in and made part of said reports by reference thereto as Exhibit B in each report in the seven cases wherein the Trust Company was plaintiff, as further explained below. They were admitted against objection, and their admission is assigned as error in all the cases.

Each subscriber thereafter testified as a witness, except that Evans, the subscriber in No. 1213, having deceased, one Paine, his confidential secretary at the time of his subscription, testified to representations made to him in connection therewith, and that instead of Mrs. Cordingley, the subscriber in Nos. 1215 and 1221, her husband, who conducted on her behalf the negotiations regarding her subscription, testified as to representations made in said negotiations.

Testimony by ten other witnesses was also introduced on the subscribers' behalf, among whom was De Lanoie, assistant trust officer of the Trust Company, whose deposition had been taken by them.

The Trust Company introduced in rebuttal testimony by Eldridge, its first vice president, Randall, its trust officer, and said De Lanoie. There were 30 directors in all, of whom Eldridge was one. Randall and De Lanoie, who managed its "trust department," were not directors.

4. Before considering the assignments relating to evidence at the trial, the following particulars regarding the various subscription agreements sued on may be stated. Copies of them were made part of the Trust Company's declarations, and the original agreement in each case was produced at the trial.

The agreements subscribed to by Abbot (Nos. 1210, 1217), Evans (No. 1213), Mrs. Cordingley (Nos. 1215, 1221), and Preston B. Keith (Nos. 1211, 1219) were in printed form, each agreement forming part of a printed pamphlet, wherein it was preceded by a prospectus purporting to be signed by the Development Company and to state facts regarding the Northeastern Cuba Railroad Company, whose bonds were therein offered for subscription.

Each prospectus set forth that said Railroad Company was organized to construct, acquire, and operate a railroad in northeastern Cuba, and that $900,000 of its first mortgage bonds were offered for subscription by said Development Company, with a bonus of 50 per cent. in its stock.

Each said prospectus stated that payments by subscribers were to be made to the Trust Company for said Development Company's account and subject to its order; also that said Development Company might borrow unpaid balances of subscriptions for account of subscribers upon the terms and conditions set forth in the following subscription agreement.

Each stated that accepted subscriptions would entitle the subscriber to bonds and stock, that payment of 25 per cent. was to be made upon acceptance, and that the right to reject any subscription was reserved.

The stipulation in the subscription agreement following each said prospectus was that subscriptions thereunder or money borrowed thereon should be paid to the Development Company for the purpose of carrying out "the undertaking."

The subscription agreement signed by Mrs. Cordingley bore date September 15, 1905. The prefixed prospectus bore no date. This prospectus and agreement differed in terms, in certain immaterial particulars, from the similar documents signed by Abbot, Evans, and Preston B. Keith, which were in identical terms; and in all these three cases both prospectus and agreement bore date November 15, 1905. The respective actual dates of subscription did not appear in any of the agreements, but were, according to the evidence, as follows: Mrs. Cordingley's, early in May, 1906; Evans', in November, 1906; Abbot's, in February, 1907; Preston B. Keith's, late in March, 1907.

The agreements signed by George E. Keith (Nos. 1214, 1220), John S. Ames (Nos. 1212, 1218), and F. Lothrop Ames (Nos. 1216, 1222) were also in print, but in a different form. They had no prospectus prefixed. That signed by Keith bore date November 15, 1906, and was signed about January 24, 1907. It stated that the subscription was limited to $700,000 of the bonds, but its terms did not differ materially in other respects from those signed by John S. Ames in May, 1907, and F. Lothrop Ames in June, 1907, which were in terms identical with each other and stated the total subscriptions to be limited to not exceeding $900,000, as did the four agreements above mentioned, dated in 1905. Neither of said three agreements contained the express stipulation, found in the other four, that the amounts subscribed or borrowed were to be paid (i. e., by the Trust Company) to the Development Company, to carry out the "undertaking." In other respects, their provisions were, for all material purposes, substantially like said other four agreements. They provided that the payments they called

for were to be made to the Trust Company, to the Development Company's credit.

5. Returning to the matter of the "map prospectuses" above mentioned in paragraph 3: Not only had the auditor made them part of his reports as above, and found the Trust Company chargeable with knowledge of their general use as inducements offered to subscribe for said bonds, but, as will appear, there was evidence at the trial, independent of the auditor's report, tending to show such use with each subscriber here a party and to charge the Trust Company with knowledge of such use.

There were four of them, all bearing date December, 1905. There were slight differences between them in the maps and also in the text, but none of substantial importance. The statements made in them purported to relate to the Northeastern Cuba Railroad Company, and to an offer made by or in the name of the Cuba Eastern Railroad Company, H. W. Bennett, president, of an issue of $900,000 first mortgage bonds of the Railroad Company first named, for subscription. Said bonds were stated to be guaranteed by the Railroad Company last named. Each of them bore at the top, "H. W. Bennett & Co., Bankers, 20 Broad St., New York." Each set forth the names of the officers and directors of said Northeastern Cuba Railroad Company, among whom appeared H. W. Bennett as president, Randall as vice president, De Lanoie as secretary and treasurer, and Eldridge as director. The respective positions held by the last three, as above, in the Trust Company, were also stated. Each set forth that the Trust Company was trustee under the mortgage securing said bonds. A map of part of the Island of Cuba, purporting to show the locations of the railroads mentioned, the constructed portions of each, and those not constructed, also their connections with other existing railroads, occupied two of the four pages of each prospectus.

It appeared without dispute that H. W. Bennett, mentioned as above in said prospectus, was in fact president of the Northeastern Cuba Railroad Company, and engaged in soliciting and obtaining subscriptions to its said bonds during the period within which these subscriptions were made (May, 1906–June, 1907; see paragraph 4 above).

6. The auditor found that said Bennett solicited each of the subscriptions here involved, describing in each case conditions in Cuba and explaining in detail the subscription agreement afterward signed, and one of said map prospectuses.

The auditor also found as to each said subscriber that he signed the agreement in suit "induced by the statements made in the circulars and confirmed orally by Bennett."

Evidence in support of these findings was also before the jury.

In each prospectus annexed to a subscription agreement, and in each map prospectus, there appeared in substance, though the terms used were not the same in all, the representations principally relied on by the subscribers, viz. that the mortgage securing the bonds was a first mortgage constituting a first lien, and that the earnings of the Cuba Eastern, which was to guarantee the bonds, exceeded its own interest requirements.

The further testimony at the trial by or on behalf of each respective subscriber (see paragraph 3 above) tended to show what Bennett said in conversations relating to their respective subscriptions, and to support the auditor's above finding as to their effect. Bennett was not called as a witness, and there was no contradiction of the subscribers' testimony as to the statements or representations made by him as above, or as to his use of the various printed documents above described, in soliciting and obtaining their respective subscriptions.

Said testimony at the trial tended further to show that certain letters from Bennett, confirming statements previously made by him to them in conversation, had been received by Abbot, Cordingley, John S. Ames, and Preston B. Keith before they subscribed; also that his letter to John S. Ames had been shown to F. Lothrop Ames before the latter subscribed.

7. Bennett's above statements and letters to subscribers were admitted in evidence at the trial, as were the map prospectuses referred to in paragraph 3, against the Trust Company's objections, made not only when they were offered, but also at the close of the evidence. Said statements or letters were admitted, in those cases respectively, involving the particular subscription claimed to have been induced by each said statement or letter, reserving the question of their admissibility in all the cases generally.

The ground of all said objections and the assignments of error based upon them was that there was no proof that the Trust Company knew, when accepting any one of said subscriptions, that Bennett had had said interviews with the subscriber or had sent him said letters, or knew what had been said at said interviews by Bennett, or what he had written in said letters, or knew that he had shown the subscriber the map prospectus, as set forth in the auditor's report or according to the subscriber's evidence in each case.

No direct evidence, it is true, appears to have been introduced with regard to any of the subscriptions, showing specific knowledge by the Trust Company, before acceptance of either subscription, of the fact that Bennett had had with the particular subscriber the particular interview or interviews testified to, or had written him the particular letter or letters, or had shown him the particular map prospectus.

8. The Trust Company contends that there was nothing showing it to have had any other relation to or connection with the subscriptions or with Bennett's activities in obtaining them, than as trustee under the mortgage securing the bonds offered, or as the designated payee for account of the Development Company of such amounts as might be subscribed, or as a lender from whom the latter company elected to borrow, according to the subscription agreements, upon the subscribers' guaranties.

If this is true, the Trust Company's contention might well prevail, that only upon direct evidence to the effect stated in the last preceding paragraph, could it be charged with any responsibility for representations or statements made either in said map prospectuses or by Bennett in confirmation thereof. If it was without any other interest in the success of his efforts to procure said subscriptions than belonged

to it in virtue of one or the other of its above capacities, and if it was participating in said efforts only by permitting its name to be used as above, such direct proof only would have been competent upon the question whether it was aware or not that any false and fraudulent representations had been made in procuring any given subscription, either by him or in said prospectuses. See Wiser v. Lawler, 189 U. S. 260, 23 Sup. Ct. 624, 47 L. Ed. 802, cited on the Trust Company's behalf.

But we are satisfied that, as the subscribers contend, there was evidence from which it might well have been found that the Trust Company had been directly interested on its own account in the success of Bennett's efforts to get subscriptions to said bonds, from the time said efforts were begun; also that in his undertaking to get such subscriptions, and in his subsequent efforts to that end, the Trust Company had all the time participated, in furtherance of said interest of its own, in such manner and to such an extent as made it responsible for the truth of representations used by him as inducements to subscribe for the bonds, if it knew or ought to have known that he was making them generally, to such persons as he from time to time approached for subscriptions, for the purpose of inducing them to subscribe. Some of the leading features of the evidence here referred to are indicated in the next following paragraph. We find no error in the admission of such portions thereof as were objected to by the Trust Company, and consider separate discussion of each assignment of error relating thereto unnecessary. We think the subscribers had the right to bring out all the facts regarding the Trust Company's relations with Bennett, and with the railroad and other enterprises in Cuba further referred to below, in connection with these bonds or his doings while seeking subscriptions for them.

9. In each case the auditor found that the Trust Company's three officials, witnesses on its behalf as above (paragraph 3), and mentioned in the map prospectuses above (paragraph 5), had constituted "the controlling force in the management" of certain Cuban enterprises wherein each said official and also the Trust Company's president, Charles T. Barney, had invested personally; that said enterprises had not been successful up to 1905, and in aid thereof the above-named officials had organized in that year both the Development Company and the Northeastern Cuba Railroad Company; also that Bennett had undertaken, with the knowledge and assent of all said officials, to obtain capital for the above-named company, and had solicited the subscriptions here involved in pursuance of his said undertaking. The Cuba Eastern Railroad Company, guarantor, according to the subscription agreements, of the bonds offered, was one of said earlier Cuban enterprises referred to.

From the testimony of the three officials of the Trust Company who were witnesses at the trial, it appeared that said Company became itself a stockholder or underwriter in the Development Company to the amount of $17,000, that its president became also a stockholder to the amount of $19,000, and that, while neither Eldridge, Randall, nor De Lanoie invested personally in the stock, though becoming officers

of the Development Company as above, each was a stockholder in the Northeastern Cuba Railroad Company, and also in the earlier Cuba Eastern Railroad Company, and each was also a director and officer of both said railroad companies. Randall testified that "all this Cuban business" was "considered desirable for the Trust Company," that its officers gave their time to the Development Company and the earlier Cuban enterprises partly for that reason, and that he became an officer in them partly to increase the Trust Company's business, and to safeguard the Trust Company's interests. A direct and immediate benefit to the Trust Company might therefore have been found involved in the success of Bennett's efforts, instead of a benefit merely contingent or remote.

Bennett's connection with the Trust Company appeared, from the testimony of its same three officials, to have been as follows: He was a stockholder in the company. He had brought said earlier Cuban enterprises to its attention in 1903, and had since actively participated in their management in co-operation with it. He was president, and, with Randall, a member of the executive committee of the Cuba Eastern Railroad Company. He was one of three trustees, Eldridge and Randall being the other two, who held a controlling part of its stock in a voting trust. He became, not only president of the Northeastern Cuba Railroad Company, the capacity in which he appeared on the prospectuses (paragraph 5 above), but also, with Eldridge and Randall, one of three trustees holding nearly all its stock under a similar voting trust. While not shown to have been an official or stockholder in the Development Company, it was that company, according to Randall, which employed him to get subscriptions for the bonds to which the agreements in suit related (paragraph 4 above). He was, as would be expected under such circumstances, often in the Trust Company's offices, consulting about all the above Cuban enterprises with its officials, not with the three above named alone, but with others as well. Each Trust Company official who testified made it clear that he knew at the time that Bennett was soliciting subscriptions for said bonds and receiving therefor a commission out of all cash payments made upon such subscriptions as he procured.

Correspondence in evidence between the Trust Company and the several subscribers here concerned, immediately following their respective subscriptions, afforded further ground for inferring active participation by said company in Bennett's efforts to procure these subscriptions, and therefore in his general efforts to procure like subscriptions.

Although the terms of all said subscribers' agreements made them agreements with the Development Company as the party offering the bonds and by whom the subscriptions were to be "accepted" before becoming binding—nothing in regard to said acceptance appeared to have been ever received from the Development Company by any of said subscribers. It was the Trust Company instead which, in each successive instance, wrote to the subscriber upon that matter soon after the subscription had been made, without further reference, so far as appears, to the Development Company for any acceptance by it. Letters

in the Trust Company's name, addressed by it to each subscriber, in-
dicated that Bennett had in each case taken the signed agreement
directly to the Trust Company. In no instance did any submission to
or action by the Development Company regarding rejection or ac-
ceptance appear. The arrangement indicated in the prospectuses and
agreements, according to which the Development Company was the
party to be dealt with, thus appeared to have been set aside by the
Trust Company itself, as to each of these agreements as soon as it was
signed; the Development Company appearing thereafter as the bor-
rower from the Trust Company of the amounts loaned upon said
agreements, but no use of its name for any other purpose being after-
ward made in connection with any subscription.

If, as all the foregoing tended to show, Bennett was in each case
under employment to find subscriptions to these bonds, by a concern
organized as above to serve the Trust Company's purposes, officered
by officials of its own, under its control, and in which it had largely
invested; if he had constantly consulted as above with said officials
regarding his efforts to get such subscriptions; and if, after obtaining
the successive subscriptions here involved, his dealings regarding them
had been directly with the Trust Company through its said officials—
representations in each instance made by him in order to induce the
subscriptions, in whatever form made, are not, in our opinion, to be
regarded as representations for which the Trust Company could dis-
claim responsibility, even if its representatives in the matter had not
actually known in each instance, at the time, what they were. By each
subscription he obtained the Trust Company would, under such cir-
cumstances, be accepting a benefit such as called upon it to know the
representations whereby the subscription had been induced, and to
refuse any subscription induced by representations which it knew or
ought to have known to be false. We are therefore unable to agree
with the Trust Company's contention that "nothing short of actual
knowledge" of Bennett's representations to each subscriber separately,
and of the fact that the map prospectuses used in each case had been
shown to the subscriber by him, could charge it with liability for state-
ments therein contained or for what Bennett said or wrote in confirma-
tion thereof. It could not say, in view of such connection on its part
therewith, that the means of knowing what representations Bennett
was using, whether on paper or orally, were not readily available to it.

But there was also evidence which tended to show that the Trust
Company's representatives in the matter had actual knowledge of the
substance of said representations and of said map prospectuses.

In the four cases wherein the subscriber's agreement had a printed
prospectus bound with it (paragraph 4 above), the Trust Company
must obviously be taken to have known that Bennett had induced each
of those subscriptions by the representations set forth in the pro-
spectus, as soon as he handed in the agreement itself. Mrs. Cording-
ley's, in May, 1906, was the earliest in date of these four, and of all
the seven subscriptions here in question. Knowing, as it must then
have known, by what representations her subscription had been in-
duced, and knowing also, as it must later have known, in November,

1906, February, 1907, and March, 1907, that Evans', Abbot's, and Preston B. Keith's had been successively induced by representations not differing in substance, the Trust Company could not have supposed, in the cases of the other three agreements signed in January, May, and June, 1907, that either of them had been procured otherwise than by means of representations to the same effect, although no printed prospectus was bound with them.

As to the map prospectuses, one of which, according to the evidence, Bennett had shown and explained to each of the seven subscribers, there was evidence to the effect that they were prepared under Bennett's directions, by one De Zayas, at the time in charge, under De Lanoie, of the offices and books of the Cuba Eastern Railroad, and in frequent daily consultation at the Trust Company's offices, directly across the street, with Randall and De Lanoie; that Bennett and De Lanoie approved the bills for printing and lithographing them; that De Zayas left 40 or 50 copies of them in the Trust Company's office; that one of these copies was afterward seen by him on Randall's desk therein; and that Randall talked with De Zayas about it. Randall testified and the auditor found that he and Eldridge had instructed Bennett to submit all such prospectuses to them before giving them to the public. Evidence of this character, although all the Trust Company's said officials attempted to deny knowledge of the contents of these prospectuses, or at least of the maps included in them, would clearly have justified a finding that they nevertheless possessed it at the time Bennett began their use.

That the map prospectuses were prepared for use as above, before any of the subscriptions in question were made, appeared from the dates which they bore. Knowledge of their contents implied knowledge of the purpose for which they were to be used. The conclusion, therefore, that when it received each subscription agreement, or payment on account thereof, the Trust Company knew that Bennett had used one of the prospectuses in obtaining it, was a conclusion that might properly have been drawn in each of the cases. And, if it had such knowledge, the Trust Company could not assert its ignorance that Bennett, with whom it was co-operating as above, had confirmed, orally or by letter, representations found in the map prospectuses themselves. His oral or written representations testified to were relied on by the subscribers, only to the extent that they tended to confirm those contained in the map prospectuses. That he would so confirm them the Trust Company must have anticipated; its representatives cannot reasonably be supposed to have expected anything else.

[4] 10. Finding no error, therefore, in the admission of Bennett's statements or letters to these subscribers, or of the copies of the map prospectuses given them by him, we cannot sustain any of the assignments of error relating to their admission. We think there was evidence sufficiently connecting them all with the Trust Company.

As stated in paragraph 7, those testified to by each subscriber were originally admitted only in the case or cases involving his particular subscription. The Trust Company, in our opinion, could not, in any event, complain of such admission. And the testimony of each sub-

scriber as to these matters was admissible, so far as we can see, in the cases relating to all the other subscriptions. It tended to show uniformity in substance and character of the representations whereby Bennett was seeking to attract all prospective subscribers with whom he dealt; and we think it thus bore, sufficiently to make it so admissible, upon the question whether the fact that such general use of such representations was being made was a fact within the Trust Company's knowledge. If so, it could not assert its ignorance of their use with any one of the particular subscribers here concerned.

[5] 11. Testimony from various witnesses called by the subscribers, to statements, oral or in letters, made to them by various officers or officials of the Trust Company at various times during the above period from May, 1906, to June, 1907, was admitted against the Trust Company's objection that they were immaterial to the issues before the jury.

Barney, Eldridge, and Randall were the officers or officials said to have made the statements here referred to. The first two, as has appeared, were directors and executive officers of said company. It is said that because Randall was neither, and that his position as head of the trust department did not appear to be such as would make statements by him binding upon the company, those statements should have been excluded. But there was evidence that the Trust Company's officers had intrusted to him the immediate charge of its interests in the Cuban enterprises referred to by the auditor, including the two Railroad Companies mentioned in the subscription agreements and the Development Company (see paragraph 9); that Eldridge relied on him for information on all matters relating thereto, and was accustomed to refer persons to him in matters involving them; also that many of his statements testified to were made in Eldridge's presence. Unless his statements or letters here in question were inadmissible on other grounds, the above objection did not require their exclusion. See Attleboro, etc., Co. v. Frankfort, etc., Co., 240 Fed. 573, 581, 582, 153 C. C. A. 377.

Two of the witnesses, testifying to conversations or letters in which said statements were made, were subscribers and parties in these cases. F. L. Ames testified to statements by Eldridge in a conversation with him at the Trust Company's New York office, in August, 1906, at which Randall, De Lanoie, and Bennett were present, and to statements by Barney in the autumn of 1906 to him at the latter's house; all these statements being prior to the witness' subscription. Abbot testified to statements by Eldridge, Randall, or both, in conversation at the Trust Company's New York office soon after his subscription, made in February, 1907, had been received. Bennett, according to his testimony, accompanied him there, introduced him, and was present.

The statements to Ames were to the effect that the Trust Company was then loaning money on the securities of "the various Cuban enterprises," and "keeping close watch of them," or that Barney was himself interested in them, or that they "promised to be very profitable." The statements to Abbot were to the effect that the Northeastern Railroad Company was prosperous; that the Eastern Com-

pany was an entirely solvent and prosperous guarantor; that the first-mentioned concern kept its accounts, papers, and records there and was "substantially in the Trust Company."

We see no reason requiring the exclusion of such statements in any of the cases. They tended to show, in connection with the auditor's reports and the evidence referred to in paragraph 9, the true relations existing between the Trust Company, said Railroad Companies, and Bennett, during the period of his efforts to get these bonds subscribed for.

Five other witnesses, not parties, testified to statements by Barney, Eldridge, or Randall to them during the same period. To their testimony what has just been said seems to us applicable, in some instances with even greater force; and against its exclusion further grounds appear.

One of them, John W. Herbert, testified to conversations with Randall in the spring of 1906, at some of which Bennett was present, and to conversations with Eldridge and Barney, to whom Randall thereafter introduced him, at the Trust Company's New York office, in May or June, 1906. According to him these conversations began with a recommendation by Randall that he join them in the Cuban enterprises, wherein the company had large interests, which recommendation Randall supported by attractive statements regarding the merits and prospects of both Railroad Companies, including statements that the Cuba Eastern Company's guaranty was absolutely good, and that the enterprise was "right under the roof" of the Trust Company, "all under our supervision and done right here." Randall gave this witness a map prospectus, like those referred to in paragraph 9, showing to him at the time on the map where the Northeastern Cuba Railroad was to be built up to a connection with the existing Van Horne system. Eldridge's subsequent statements to him were, in part, that he would like very much to have Herbert take an interest in that enterprise. Barney's statements were, in part, that he thought very well of that enterprise and had himself subscribed for the bonds. Among them were the following:

"It is one of our schemes; we have charge of it; Mr. Randall has been delegated to represent us; the management and control of the company is under the Trust Company's control, and all managed in its New York office."

Statements like these, though not made to any subscriber here a party, tended to show that in point of fact the Trust Company, besides being in close connection, for purposes of its own, with the management of said railroads, was also itself endeavoring, and at Bennett's suggestion, to promote subscriptions for the bonds by representations of the same character as those being made by Bennett, acting, as above, under its supervision. They further tended to contradict any denial on the part of the Trust Company that the contents of the map prospectuses were unknown to it.

We do not find it necessary to recite the substance of the statements testified to by Weld as made to him by Randall, in conversations or letters, between December, 1906, and May, 1907, to whom also Bennett had given a map prospectus and to whom Randall inclosed in

one of the letters copies of letters to Bennett from De Lanoie, and from Perrin, consulting engineer of the Cuba Eastern Railroad, regarding its prospects and condition; nor of those testified to in a deposition by Colvin as made to him by Eldridge or Randall in Barney's presence, in the spring of 1906, at the Trust Company's New York office, in connection wherewith Randall gave him a map prospectus; nor of those testified to by Baker as made to him by Eldridge or Randall in 1905 or 1906, in conversations at the same office, where he had gone at Bennett's suggestion, and where a map prospectus given him by Bennett was discussed with and statements made in it confirmed by Randall; nor of those testified to by Dewey (a subscription from whom Bennett, introduced to him for the purpose by letter from Barney, had obtained after showing him the map prospectus) as made to him afterward by Barney in March, 1907. For one or the other of the reasons above stated we are unable to hold that there was error in the admission of any of these statements or letters.

12. All the subscribers' agreements, except George E. Keith's, provided (as stated in paragraph 4) that "the subscriptions hereunder shall be limited to $900,000," or "to not exceeding $900,000," par value of the bonds offered. In George E. Keith's agreement $700,000, instead of $900,000, was the amount stated.

By amendments to their respective answers, filed October 31, 1914, each subscriber alleged in substance that, notwithstanding the above provisions, subscriptions were received and the Trust Company had certified and delivered bonds to an amount exceeding $900,000, when the agreement sued on was signed; also, that with intent to aid the sale of the bonds by means of the false representations described in the answer, the Trust Company had knowingly certified and delivered said bonds in violation of conditions prescribed by the mortgage securing them, held by it as trustee, and that by reason of said acts the defendant was not liable upon the agreement.

The issues raised by these amendments were not before the auditor, whose report had been filed before said amendments were made.

Evidence introduced by the subscribers, from the Trust Company's own books, would have warranted findings that on May 26, 1906, the Trust Company had certified and delivered such bonds to the amount in all of $983,000; on December 8, 1906, to the amount in all of $2,011,000; and on June 11, 1907, to the amount in all of $2,500,000. This evidence was admitted, in connection with other evidence set forth in the next following paragraph, against objection by the Trust Company that it was immaterial to any issue in the case; that the language of the subscription agreements did not import any agreement with the subscribers that the total issue should be limited to $900,000; that if there was such an agreement the fact had not been made the basis of any false representations; and that if available at all to the subscribers it could be so only in an action of contract.

The court instructed the jury that the language of the subscription agreements must be understood as confining the limitation of $900,000 to the particular offer of bonds made in them, and that no defense upon the ground that the limitation had been exceeded and the con-

tracts broken by the Development Company "at the very start of the transaction" had been made out. The court, however, in order that the question might be finally settled by this court, had the jury answer, among other questions submitted to it, questions No. 5, whether at the time of making the subscription agreements sued on more than $900,000 of bonds previously certified and delivered by the Trust Company were outstanding; No. 5a, whether, if so, the fact was known to said Company when it made the loans upon the agreements; and No. 5b, were the defendant subscribers ignorant thereof? To each of the above questions the jury answered in the affirmative.

No exception to the court's instructions construing the language of the subscription agreements as above is before us; the subscribers, although excepting thereto when given, having brought no writs of error to review them. The subscribers nevertheless contend that, although the jury's answers to the above questions were immaterial in view of the construction adopted by the court, said answers must stand, and that they afford ground for affirming the judgments below, because not affected by any of the Trust Company's assignments of error, and because based on evidence from the Trust Company's own books, that said Company participated in a material breach of the subscription agreements, and thereby forfeited the right to insist upon their performance.

But this would require us to declare the court's construction erroneous, in the absence of any assignment to that effect. If, under the circumstances, it would be within our power so to deal with it—and the subscribers fail to satisfy us that it would—they also fail to convince us that it was in fact erroneous, and that the construction contended for by them was correct. We therefore regard the above answers of the jury as having now become immaterial.

This leaves to be disposed of the Trust Company's contention that the admission of the evidence from its books, and the submission of said questions to the jury was error requiring reversal. The evidence referred to we regard as properly admitted in view of the further evidence above referred to, which we consider below. The Trust Company fails to satisfy us that it was unduly prejudiced by the above submission to the jury. It could not dispute what its own books showed as above, and it did not attempt to show that the subscribers had any knowledge when they signed as to the facts so shown.

13. The above evidence from the Trust Company's own books showed also successive dates in 1905, 1906, and 1907, whereon the successive amounts making up the total amounts of bonds certified and delivered on or before the above dates specified in paragraph 12 were certified for delivery. The following were also put in evidence against the Trust Company's objection:

(1) The mortgage of all the Cuba Northeastern Railroad Company's property held by the Trust Company as trustee to secure the bonds subscribed for. In this were provisions that no bonds should be valid until certified by said trustee, and the purposes for which and the conditions under which the necessary certification and delivery might be made were prescribed. In the case of bonds issued for construction

247 F.—54

and equipment, resolutions of the Railroad Company's directors, affidavits by its president as to the complete construction were required; and a specified amount per mile of actually completed track was not to be exceeded. In the case of bonds issued for working capital, resolutions by the directors were required, and neither the specified total amount nor a specified annual amount was to be exceeded.

(2) Successive resolutions adopted by said directors, among whom, as above, were Eldridge, Randall, De Lanoie and Bennett, and who met usually, if not always, at the Trust Company's New York office. The resolutions appeared from the directors' records there kept. Each recited that according to certificates by Sims, chief engineer in charge of the construction in Cuba, various lengths of track had been constructed and were in operation, and each requested the Trust Company to certify and deliver certain amounts of bonds accordingly.

(3) The successive certificates by Sims as actually received by said directors.

(4) Also, from the Trust Company's books, the dates and amounts of deliveries made by it of certified bonds.

Randall, called in rebuttal by the Trust Company, was cross-examined, against its objection, as to the dates upon which the various certificates from Sims were actually received, and their correspondence with the dates of the above resolutions.

From all the above, and from what had also appeared from the Trust Company's books, as stated in paragraph 12, it might have been found that bonds had been certified and delivered as above upon directors' resolutions, adopted November 14, 1905, and January 23, 1906, both purporting to be based upon the necessary certificates of construction, although such certificates had not, as the Trust Company knew, or should have known, been in fact received, in violation of the above mortgage conditions and as alleged in the amendments to the subscribers' answers referred to in paragraph 12.

We find no error requiring reversal in the admission of this evidence. Its consideration was proper, at least in connection with the evidence considered in paragraphs 9 and 11, upon the extent to which the Trust Company had been an active participant with Bennett in promoting sales of the bonds. Whether or not there had been such violation of the mortgage conditions by said certifications as would of itself operate to release the subscribers from their agreements, was not a question submitted to the jury for answer.

14. Three only of the various false representations whereby the subscribers alleged their subscriptions to have been induced were specifically mentioned, in the instructions given, as calling for findings by the jury whether or not they were, as the auditor had found (paragraph 2 above), in fact false and fraudulent, and, if so, whether or not, as he had also found, they were made with knowledge and acquiescence on the part of the Trust Company, though aware that they were untrue.

These were: That the bonds were first mortgage bonds; that the mortgage was a first lien on all property of the Cuba Northeastern Railroad; that the earnings of the guarantor company (Cuba Eastern Railroad) were in excess of its interest charges, or that said company was "on an interest-paying basis."

With these three of the alleged false representations only, the auditor had specifically dealt as above in his report. All three were in substance made in the printed prospectus annexed to each of the four subscription agreements specified in paragraph 4, and also in the map prospectus given each subscriber by Bennett. That he had also made them in his negotiations with the subscribers might also have been found from the evidence at the trial.

[6-8] 15. The mortgage in question, in evidence as has been stated, was dated March 1 and executed August 30, 1905; and there is no question that it purported to be a first mortgage upon said property or that it was duly executed on the grantor railroad's behalf. It had, however, as is also not disputed, never been recorded in Cuba where the property was situated.

The auditor's findings were, that the grantor railroad had never been registered in Cuba; that under Cuban law, being a foreign corporation, such registration was necessary before it could own property or do business in Cuba; and that, in order to make an otherwise valid mortgage a lien upon real estate in Cuba, recording according to the requirements of Cuban law was necessary. Notwithstanding a record before him of proceedings for foreclosure of said mortgage, begun in the United States Circuit Court for the New York Southern District in April, 1909, after the present suits had been begun (to which further reference is made below), he further found and ruled that the mortgage never constituted a valid lien within the meaning of the representations made as above.

Uncontradicted evidence before the jury was to the effect that the mortgaged property belonged, when the mortgage was executed, to the Cuba Eastern Railroad, which had never transferred it to the mortgagor. From an expert in Cuban law there was uncontradicted testimony that a mortgage not recorded under that law was of no effect against third parties, and that between the parties it constituted at most a personal obligation.

In the court's instructions that, if the testimony regarding the Cuban law was believed, no first lien upon the property was created by the mortgage, we find no error. Whatever its effect between the parties under Cuban law, unless it established rights under that law against third parties in respect to the property, corresponding to those generally secured by first lien mortgages, the contention that it might be a first mortgage constituting "a first lien," within the meaning of the representations, seems to us of no serious consideration. The law of Cuba, where the property was situated, being the law of a foreign country, and having to be proved as a fact, there could be no presumption that it was the same as the law of this country which would justify false representations as to the standing of a mortgage necessarily governed by the Cuban law. The court rightly declined to give instructions involving a different assumption, and we find no error in the instructions given regarding the matter.

The representation regarding the mortgage necessarily meant that it secured rights in the property which would outrank adverse claims. We find no error, therefore, in the exclusion of evidence offered by

the Trust Company to the effect that no adverse claim upon the property mortgaged had in fact been asserted.

As to the record in the New York foreclosure proceedings, although the court wherein such proceedings were conducted may have had jurisdiction of the then trustee under the mortgage, as representing holders of the grantor railroad's bonds, and also of the guarantor railroad's creditors and stockholders, these subscribers for bonds were never parties subject to such jurisdiction, and they had repudiated their agreements to become bondholders before said proceedings were begun, so far as this could be accomplished by notice to the Trust Company. At no time during their continuance were these subscribers asserting any interest under the mortgage or in any privity with any party to the proceedings regarding it, and the decree therein in no way bound them. It purported to declare the mortgage a first lien upon the mortgaged property; but, said property not being within the court's jurisdiction at any time, such a declaration could have no further operation than as it may have estopped the parties to the suit. Rendered as it was in a suit begun in 1909, it could not have established such a lien, valid under Cuban law, as would satisfy the representation made in 1905–07. We find no error in any refusal to instruct otherwise.

Having admitted said record, the court also admitted, for the jurors' consideration as bearing upon the question whether the representations that the mortgage was a first lien were material and fraudulently untrue, evidence that, under and by virtue of said decree, the property mortgaged was ultimately applied for the benefit of holders of the bonds secured thereby. Of such admission, the Trust Company, in our opinion, can have no right to complain.

16. As to the representations that the Cuba Eastern Railroad was earning more than its interest charges, the auditor found that they were untrue, and that, on the contrary, the railroad never reached an interest-paying basis, but the interest on its bonds, which it had regularly met, was in fact paid out of funds other than what could be properly called railroad earnings. There was also evidence before the jury from which the same findings might properly have been made. Parts of such evidence, admitted against the Trust Company's objection, are claimed to have been erroneously admitted.

(1) De Zayas, in charge, under De Lanoie, as stated in paragraph 9 above, of the railroad's bookkeeping, gave testimony contained in a deposition taken by the subscribers in New York, in 1910. According to his testimony, monthly statements from Cuba were received during the period covered by these subscriptions, purporting to show the railroad's earnings and expenses; its first mortgage bond interest amounting in all to $60,000 each year. Asked whether, as its earnings were so reported, month by month, it earned in 1905–07 said bond interest, he answered, "No." The question and answer were admitted on the understanding that the question amounted only to asking how much said earnings, as reported, were. We find no error in the admission.

[9] (2) Another deposition, taken on the subscribers' behalf in 1910, was that of Hatch, an expert accountant, who, under an employment in 1906 to "straighten out" the books and accounts of the Cuba Eastern Railroad, had worked on them in Cuba during the greater part of the

year, September, 1906, to September, 1907, and had thereafter brought said books and accounts with him to New York, where he completed his work on them in 1908. He.produced and identified said books in connection with his deposition, and offered as part thereof a tabulation made by him from the entries he found therein, purporting to show, among other things, the railroad's earnings, gross and net, its operating expenses, and its fixed charges for each six months period from January, 1904, to June, 1908. This tabulation, so far as it covered the above period to June, 1907, had been before the auditor with the deposition, had in part formed the basis for his findings, and would have warranted like findings by the jury. It is undisputed that, neither when Hatch's deposition was taken, nor at any time before the auditor, did the Trust Company object on the grounds that the books themselves were not produced. This objection, however, it raised for the first time at the trial, seeking by means of it to exclude both the tabulation and Hatch's testimony as to what he had found on the books.

Though in Hatch's custody when he gave his deposition, at the time of the trial the books were neither in his custody, nor in that of the Trust Company, nor in that of the railroad company, whose books they were, nor were they within the jurisdiction of the court. It appeared that after the completion of the deposition they had been until 1912 in the Trust Company's vaults for safe-keeping, under control of the committee representing the first mortgage bondholders, and had in that year been surrendered to another corporation, having its offices in New York, which had become, under a reorganization, successor to both the Cuba Eastern and the Cuba Northeastern Railroad. This company had not complied with a request by the subscribers to have them brought to Boston for use at the trial.

In declining to exclude Hatch's tabulation, and his other testimony relating thereto, as given in his deposition, because not accompanied by the books themselves, we think the court committed no error. Their production by Hatch when he gave his deposition afforded the Trust Company due opportunity for proper examination, of which opportunity it did not avail itself. It had never reserved any objection to his testimony regarding the contents of the books as inadmissible without the books themselves. The assertion of that objection for the first time at the trial could not justly be permitted to deprive the subscribers of the benefit of said testimony. Burton v. Driggs, 20 Wall. 125, 22 L. Ed. 299. Drumm-Flato, etc., Co. v. Edmisson, 208 U. S. 534, 28 Sup. Ct. 367, 52 L. Ed. 606, relied on by the Trust Company does not require a different conclusion. There a party seeking to make the contents of its books evidence in its own favor, offered the deposition of its bookkeeper, accompanied by copies of the books annexed thereto, against objection taken at the time that the books themselves were the best evidence and must accompany the deposition.

Objections based upon the contention that Hatch's discretion in selection from the books had entered into his tabulation were insisted on at the trial, though not made when his deposition was taken. The appellants fail to satisfy us that any of these objections required the exclusion of any of his testimony. According to it, in his work upon the books, though it consisted partly in transcribing and rearranging them,

or in completing them from the papers and accounts before him, he had made no change in original entries appearing during the period prior to May, 1907. Not only was he cross-examined at length regarding his dealings with the books in connection with his tabulation, but a previous report on the same books, from the beginning of 1904 to November 30, 1905, was before the jury, as was also De Zayas' deposition regarding them. Both said reports had been before the auditor with Hatch's and De Zayas' depositions, and referred to in his report. We think the tabulation and testimony were properly admitted, as tending to show what the books disclosed as to the earnings in question, and that it was for the jury to say how far they could be relied on for that purpose. None of the objections raised to specific items of the tabulation, that they were irrelevant upon the question as to net earnings during the period covered, seem to us valid. These items, in connection with Hatch's testimony regarding them, were proper matters for the jury's consideration in determining what the Cuba Eastern's own books had contained as to its actual net earnings, its financial condition, and its financial transactions bearing upon the true amount of said net earnings. We cannot hold that the court's refusal to exclude them from such consideration was error.

(3) Nor can we hold that the contents of the Cuba Eastern's books, so far as shown by Hatch's testimony or otherwise, ought to have been excluded as, in any event, inadmissible against the Trust Company. The evidence, already referred to, tending to connect the Trust Company with the Cuba Eastern's management and with the keeping of its books, we consider sufficient, if believed, to charge it with knowledge of what had been entered on said books with regard to matters such as those covered by Hatch's testimony and tabulation.

17. If the representations that the mortgage gave a first lien, and the Cuba Eastern's earnings exceeded its interest requirements, could properly have been found untrue by the jury, we cannot sustain the Trust Company's contention that it could not properly have been found aware of their untruth when it made its loans upon the subscribers' agreements.

As to the mortgage, the auditor's findings were, that correspondence between Sims, general manager of the road in Cuba—to whom the mortgage had been forwarded for record in 1905—and Randall, which was shown to Eldridge, De Lanoie, and in some instances to Barney, and covering the period August, 1905–February, 1908, informed the Trust Company that the Northeastern Cuba Railroad was never registered in Cuba, never had title to the property mortgaged, and that there had never been any recording in Cuba of the mortgage itself. That the evidence before them would have warranted the jury in coming to the same conclusion, we cannot doubt. No serious ground for any such doubt, indeed, seems to us suggested in the Trust Company's briefs.

The Trust Company does contend that good reason for a belief on its part that the mortgage had been recorded, and that, whether it had been or not, it was, by universally accepted law, a valid mortgage establishing a valid lien, might reasonably have been found from all the evidence, and therefore that it could not have been guilty of intent to

cheat or defraud.  A belief, contrary to knowledge which* it might have gained by due use of means under its control, could not, in our opinion, enable it, as against these subscribers, in fact misled by representations contrary to fact, to enforce subscriptions induced thereby and by it accepted and acted upon in silence.  Acquiescence on its part in the misleading representations, under such circumstances, would be a legitimate inference.

As to the Cuba Eastern's earnings, the auditor's findings were that Eldridge, Randall, and De Lanoie—and therefore the Trust Company, —are chargeable with knowledge of the untruth of the representations made that the earnings were more than enough to meet interest requirements, and that the company was on an interest-paying basis.  From the evidence before them the jury was warranted in adopting these conclusions.  The facts upon which the auditor based them might well have been found by the jury, from said evidence, to the following effect: The various Cuban enterprises above mentioned, whereof the Cuba Eastern was one, having, in 1905, proved unsuccessful, notwithstanding doubts whether it would not be better to stop there and take the loss, the Trust Company's officers and officials in control of their management (see above paragraph 9), had proceeded to organize and control the Development Company in their aid.  Sims, already selected by them in 1904 as the Cuba Eastern's general manager, had been, from the time he entered upon his duties, in constant, almost daily, communication, by letter or telegram, with Randall or De Lanoie regarding that railroad, its progress, prospects, and finances.  All information of importance so communicated was habitually shown to Eldridge and at times to Barney.  The correspondence was kept on file in the Trust Company's office.  Besides the books kept in Cuba, those kept in New York by De Zayas and De Lanoie as above, there were various accounts with the Cuba Eastern kept on the Trust Company's own books.

That the Trust Company is chargeable with knowledge of what appeared from its books or from said correspondence files relating to an enterprise thus set on foot, under its supervision, in the hope of averting disaster to an earlier enterprise, wherein its reputation and credit had become involved as above, seems to us a legitimate conclusion.  That the methods actually resorted to for meeting the Cuba Eastern's bond interest as it became due, payable at its own office, had been the subject of frequent and anxious consultation among its officers and officials referred to above, appeared from their own testimony before the jury, as did also the actual character of the methods involved.  It was for the jury to say whether or not, in view of them, the bond interest had in fact been exceeded by the road's earnings.

[10] 18. Error is assigned by the Trust Company in respect to comments made by the court regarding certain of the letters from Sims which it put in evidence as tending to show the character of the information received by it from him, at various times during the year 1906, regarding the Cuba Eastern Railroad under his management.  It complains that these were prevented from having due weight with the jury by remarks from the court while they were being offered.  It appeared,

as the Trust Company contends, that during the period covered by said letters, the Cuba Eastern's bookkeeping had not, for a variety of reasons, been kept up to date, that its books were being remodeled and perfected by auditors as above, and that, except as gathered from Sims' statements, it was without information regarding the condition and progress of the road or its business, and that said letters were material on the question whether or not, in 1906, the officials in New York were informed as to the road's earnings since January 1, 1906; and on the question of their good faith. The letters, besides reporting as to details and requirements of construction work, contained encouraging statements as to the road's prospects of obtaining business.

The comments complained of were to the effect that the letters bore only remotely on the issues raised regarding the representations to the subscribers, and that such details as they dealt with were not likely to be of importance enough for the determination of said issues, to warrant the addition they made to the documentary evidence already before the jury, or the time necessarily consumed in reading them. The court appears to have made said comments in an effort to prevent undue accumulation of evidence only remotely material.

We think the view taken by the court as to the contents of the letters in question is justified by the record. It was the truth or falsity of specific representations, and the knowledge of the Trust Company relating thereto, upon which the jury were to pass; and the extent to which its officers and officials may have been encouraged to expect an ultimate favorable result from the enterprise had for that purpose little, if any, importance. The jury were more than once cautioned by the court, in connection with said comments, that they were to be guided by their own judgment upon the questions of fact before them, and not by any opinion regarding facts which the court might express. We do not think the comments in question, under the cautionary and qualifying remarks, were necessarily prejudicial, or that they exceeded recognized limits. We find no error warranting reversal upon this ground.

What has been said applies also to other comments complained of, relating to matters other than the Sims letters referred to.

[11] 19. In the seven suits brought against subscribers by the Trust Company, the jury were instructed, in substance, that if the agreements sued on were invalid as between the subscribers and the Development Company, appearing in said agreements as the party offering the bonds (paragraph 4 above), because procured by material false and fraudulent representations, the Trust Company could nevertheless recover, unless it knew, when making its loans and accepting said agreements as collateral, that they had been so procured; but that, if satisfied that the Trust Company then knew them to have been so procured, the burden being upon the subscribers to prove such knowledge, the jury's findings should be for the subscribers.

As to the alleged representations regarding the mortgage and the Cuba Eastern's earnings (paragraphs 16, 17, above), instructions were given defining the meaning of the terms therein used, and the jury were left to say whether the subscribers had sustained the burden of

showing them to have been false. If found to have been false, whether they were shown to have been material and fraudulent, was left to the jury; "fraudulent" being in substance defined as intentionally deceitful, and "material" as having been a real moving cause inducing the making of the contracts. A number of alleged false representations set forth in the subscribers' answers, other than those specifically dealt with as above (paragraph 14), and in the auditor's reports, were treated as requiring no definition of their language by the court, and the jury were left to deal with them according to the instructions already given regarding the representations as to the mortgage and the net earnings of the guarantor railroad. The representations thus dealt with were as to specific opportunities for profitable business to be made available by construction of the road, and of importance mainly as tending to encourage belief in the representations regarding its earnings.

As to what would amount to knowledge on the Trust Company's part of the making of said representations, or of their false and fraudulent character, the instructions were in substance that knowledge coming to its officers, knowledge of Randall and De Lanoie, so far as obtained in performing duties delegated to them by it, knowledge to be gathered from entries on its own books, the knowledge acquired by Randall and De Lanoie in matters not delegated to them by it as part of their duties, but which, acquired by them, they communicated to its officers, was to be taken as knowledge of the Trust Company. Such knowledge had been shown, it was stated, of the contents of the book prospectuses accompanying four of the agreements (paragraph 4 above). As to the contents of the map prospectuses, it was left to the jury to say whether or not they would believe denials by Eldridge and Randall that they had knowledge thereof. The jury were told, in substance, that if satisfied that Bennett had habitually, commonly, and as his regular practice used said map prospectuses as inducements to subscribe, and if Eldridge or Barney, or Randall, so far as he communicated it to Eldridge, knew that fact, the inference would be warranted that the representations in said map prospectuses had been used, with the Trust Company's knowledge, in procuring each subscription here in question, and, if satisfied that the representations in all said prospectuses were in fact false and fraudulent, that similar inferences would be warranted as to the Trust Company's knowledge of their false and fraudulent character.

The jury found for the defendant in each of the above suits, and also found specially, in answer to questions propounded by the court, that the agreement sued on was procured by false and fraudulent material representations relied on by the defendant; that the fact that it had been so procured was known to the Trust Company at or before the time when it loaned money on the security of the agreement; and also at or before the time when it received and credited the sum received by it in payment or part payment thereunder.

Neither in the instructions given as above, nor in the above method of submission to the jury, do we find any error warranting reversal of the judgments entered for the defendants. The main reasons for this result have already appeared in what has been said. Separate

consideration of the many assignments of error, based upon refusal of the court to give numerous specific instructions requested, would occupy much space, and is believed unnecessary. After examination we are unable to say, in the case of any, that the court was bound to rule or instruct in the terms requested.

In one of said seven suits against subscribers, viz., No. 1213, against the Evans estate, the above instructions were made applicable only to the recovery sought of the amount loaned by the Trust Company upon Evans' agreement as collateral. It had also, as was not disputed, advanced on his account at his request, the payment upon acceptance of his subscription, and the amount so advanced was claimed in a separate count of its declaration—as to which the jury were instructed, in substance, that the Trust Company was entitled to recover, unless the defendant established, by a fair preponderance of evidence, that it made said advance in pursuance and in furtherance of a scheme, to which it was a party, to defraud him by obtaining money from him by means of fraudulent representations concerning the bonds. The instructions regarding this portion of the recovery sought in No. 1213 were, as will appear below, similar in effect to those given regarding the recoveries sought by subscribers against the Trust Company in the six suits referred to in the next following paragraph, and in connection with them the special findings of the jury there referred to are to be considered. The verdict in No. 1213 was, as has been stated, for the defendant.

20. In the six suits brought by the subscribers against the Trust Company, the jury were, in substance, instructed that the subscriber would not necessarily be entitled to recover, even if their finding should be that the Trust Company knew of fraud affecting the agreement at the time when it accepted the same as collateral; that the subscriber must show more than mere knowledge on the Trust Company's part that payment to it of the money claimed had been induced by false and fraudulent representations; and that active participation on its part must be found, in a scheme so to procure money, in view of all the evidence relating to Bennett's representations to and dealing with said subscribers and the Trust Company or the Trust Company's connection and dealings with him or with the Development Company, and with the previous Cuban enterprises, in order to warrant recovery by the subscriber. Besides the other questions submitted to them, the jury were asked to find specially whether the Trust Company was knowingly co-operating, with Bennett or others, in a plan to procure subscriptions to the bonds by making false and fraudulent representations about them to the prospective purchasers thereof, and, if so, whether the subscription agreement sued on was so procured in pursuance of said plan.

The questions were answered by the jury in the affirmative, and their verdicts were in each of said six cases for the plaintiff subscriber for the amount paid to the Trust Company, with interest.

The Trust Company fails to satisfy us that it was entitled to instructions more favorable to it than the above upon the points involved in the suits against it, or in that portion of its claim in No. 1213 referred to in paragraph 19 above. In the view we have taken of all these cases

we are unable to hold that any error was committed in any of them requiring reversal of the judgment.

In Nos. 1210–1216, inclusive, the judgments of the District Court are affirmed. The defendant in error in each case recovers costs in this court.

In Nos. 1217–1222, inclusive, the judgments of the District Court are affirmed, with interest. The defendant in error in each case recovers costs in this court.

## On Petitions for Rehearing.

PER CURIAM. The grounds set forth for these applications consist mainly in assertions that certain of the conclusions reached in our opinion of December 20, 1917, are erroneous. The arguments in support of these assertions are to a great extent either arguments made in substance at the hearing or such as might then have been made if regarded as important; and however appropriate upon a rehearing, if granted, they do not seem to us appropriate for the purpose of showing that essential features of the case have been overlooked or misunderstood.

1. The conclusions stated in paragraph 15 of the opinion are those first complained of by the petitioner. The Trust Company's reliance upon the propositions that the New York court referred to had jurisdiction over the mortgage trustees, the mortgage and the mortgaged property, and that its decree was entitled to full faith and credit, seems to us sufficiently dealt with and disposed of by what is said in the opinion. We cannot regard the Trust Company as entitled to claim that these contentions have not been duly considered.

[12] 2. The conclusions stated in paragraph 16 (2) of the opinion are those of which the petitions next complain.

Assuming that the stipulation between counsel before Hatch's deposition was taken should properly have been included with his deposition in the record, as it was not, it could have been considered by this court only upon the assumption that it was before the District Court when the ruling was made at the trial admitting Hatch's tabulation from and testimony about the books referred to, notwithstanding the fact that the books themselves were not then produced before the jury; and we should still be unable to find sufficient ground for holding erroneous the ruling made by the District Court, in view of the facts of the case as then before it. The proper time to cross-examine Hatch upon his testimony regarding the books was when he gave his deposition, having them before him. We do not think that the stipulation as to the reservation of objections, without distinct notice that production of the books would be insisted on when the deposition was used, could justly have been treated as entitling the Trust Company to decline the opportunity for cross-examination then offered, and at the trial, having raised no such objection before the auditor, to accomplish the exclusion of Hatch's testimony regarding the books because of their nonproduction with his deposition.

Testimony like Hatch's regarding these books is, generally speaking, admissible without production before the jury of the original books

themselves, provided only that the books are at hand, or accessible to the opposing party if the occasion seems to require it. In the case of these books, the bookkeeping had been done under the general control and supervision of the Trust Company's officers or officials who constituted the controlling force in the Railroad Company's management. Under the circumstances shown, which include the Trust Company's relation to the Cuban enterprises referred to in paragraph 9 of the opinion, and to this Railroad Company; its at least quasi custody of the books, and Hatch's relations to the Trust Company and to the Cuban enterprises; and in view of the unseasonableness of the objection based on their nonproduction at the trial—we deem it a question of little substance whether the books, or any of them, were in New York or in Cuba when Hatch testified. We find nothing to show that his tabulation included anything which could not have been found on the books kept in New York.

3. The remaining conclusions whereof the petitions complain are those set forth in paragraph 9 of the opinion. In what is urged regarding them, we find nothing more than reiteration of arguments already fully considered and passed upon. A statement made in the opinion that "he [Bennett] was a stockholder in the company" is contradicted, and the assertion is made that there was no evidence to that effect. We think the statement fully warranted by the testimony of Randall, the Trust Company's trust officer, given by him when called as a witness in rebuttal by the Trust Company. During his cross-examination he said, among other things, in answer to X–Q. 55, on page 787 of the record:

"Bennett was a stockholder in the Knickerbocker Trust Company for a small amount. The stock in 1905 and 1906 was worth $1,000 a share."

No judge who concurred in the judgments heretofore rendered desiring that the present petitions for rehearing should be granted, they are denied.