## WISER v. LAWLER.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 174. Argued February 25, 26, 1903.—Decided April 27, 1903.

Promoters of mining enterprises, in the preparation of prospectuses, are bound to consider the effect that would be produced upon an ordinary mind by the statements contained in them, and in estimating the probability of persons being misled by them, the court may take into consideration not only the facts stated, but the facts suppressed.

Vendors of mining properties are not responsible for false statements made in prospectuses issued by a mining company to whom the properties had been sold, unless they knew or connived in such statements, or were active in putting them in circulation. While they may have known that prospectuses were being issued, they were under no obligation to read them, or contradict their statements or promises, or interfere with their circulation or distribution.

If their title be of record, they are not bound to give notice of their rights in the property to the purchasers of stock, or to refuse the money due upon their contract of sale when it is tendered them.

To constitute an estoppel by silence there must not only be an opportunity but an obligation to speak, and the purchase must have been in reliance upon the conduct of the party sought to be estopped.

A person holding a deed of property which he has placed upon record, is not ordinarily bound to disclose his title to persons contemplating purchasing, or making improvements upon the land, unless his silence be deceptive, or accompanied by an intention to defraud.

This was a complaint in the nature of a bill in equity filed in the District Court of Yavapai County, Arizona, by appellants,

for themselves and all others interested, against John Lawler and Edward W. Wells, principal defendants, and the Seven Stars Gold Mining Company, The Industrial Mining and Guaranty Company and John Griffin, receiver of such companies, to adjudge Lawler and Wells to be estopped from disputing the title of the Seven Stars Company to certain mining properties, and to decree such properties to belong to that company, and for an account of the proceeds of all ore taken from the mines and received by defendants Lawler and Wells, or, in the alternative, for a money decree against them for the aggregate amount paid by plaintiffs and others for stock in the company, upon the representations contained in certain prospectuses and maps, by which the plaintiffs were induced to purchase stock in such company, and for a confirmation of the title to the property in such defendants.

The cause came on for hearing upon the pleadings, and at first resulted in an interlocutory decree in favor of the plaintiffs, with an order for an accounting by defendants. The case was then referred to a master to report the number of shares in the Seven Stars Company subscribed and paid for, and to ascertain the amount paid to defendants Lawler and Wells on account of the purchase price of the property. This was finally fixed at the sum of $180,139.82, which was held to be a lien, and the property was ordered sold in satisfaction thereof. A new trial was subsequently granted, upon the hearing of which, upon pleadings and evidence, it was held that plaintiffs were entitled to no relief, and the complaint was dismissed, and an appeal taken to the Supreme Court of Arizona, which affirmed the decree of dismissal. 62 Pac. Rep. 695.

The Supreme Court made a finding of facts in sixty-four paragraphs, which is quite too long to be reproduced here, which may be summarized as follows:

In May, 1892, the defendants Lawler and Wells were the owners of the legal title to a collection of mines known as the "Hillside Group," the muniments of such title being of record in the county recorder's office of Yavapai County.

Lawler and Wells offered these mines for sale at $450,000 cash, and on May 12 one Warner visited the mines and con-

tracted for their purchase for $450,000, paying $20,000 in cash, the remainder to be paid in installments in accordance with the terms of an escrow agreement entered into between Lawler and Wells and one Cowland. This agreement provided, among other things, that a deed conveying the mines to Cowland be held in escrow by the Bank of Arizona and be delivered upon paying the full sum of $450,000 ; and that upon the failure of the payments the deed should be redelivered to Lawler and Wells and all payments be forfeited. Cowland agreed that all moneys paid by him should belong to Lawler and Wells and should be retained by them as liquidated damages accruing from the failure to pay for the property, and Lawler and Wells be released from any obligation to convey the property. It was further agreed that Cowland might take possession of the property, develop and operate it; the proceeds to be paid to the vendors and credited upon the purchase price ; that Lawler and Wells should, nevertheless, remain in legal possession of the property until full payment, but should not work it or interfere with its operation by Cowland. It was further agreed that, should Cowland fail to make any payments, all improvements on the property and ore taken therefrom should be the property of Lawler and Wells. A deed of the property was executed to Cowland and placed in escrow as above stated. Warner was the real party in interest and Cowland only his agent.

On June 14, Warner and Cowland, with some others, incorporated the Industrial Mining and Guaranty Company for the purpose of handling mines and buying and selling stock, to which company Cowland delivered a written assignment of all his interest in the escrow agreement, as well as a deed of the mining properties with a covenant of warranty against incumbrances. The new company assumed all the covenants of Cowland in the escrow agreement, to make the payments therein stipulated, and to procure the escrow deed then in the hands of the Bank of Arizona. Possession of the properties was delivered to the new company with full knowledge on its part of the terms of the escrow agreement. The company remained in possession until October 1, 1892.

On August 15, 1892, Warner and several others incorporated

the Seven Stars Gold Mining Company under the laws of New Jersey, of which certain persons, including one of the plaintiffs, were elected directors. About the same time the Guaranty Company offered to sell and convey all its interests in certain mining properties, including a part of those described in the escrow agreement, to the Seven Stars Company, upon receiving $2,800,000 in cash of stock of such company. On October 1 the Guaranty Company placed the Seven Stars Company in possession of the Hillside Group, with full knowledge on the part of the latter of the terms of the escrow agreement.

The Guaranty Company, as the agent of the Seven Stars Company, issued in September, 1892, a prospectus, known as the American prospectus, to promote the sale of the stock of the Seven Stars Company, 300,000 of which prospectuses, accompanied by a map and an application for subscription to stock, were circulated throughout the United States. In October, 1892, the Guaranty Company directed the issuing of an English prospectus, which was never circulated, but another, issued without the authority of the Guaranty Company or the Seven Stars Company, was prepared, supervised and circulated by Cowland. The descriptive matter in this prospectus was obtained from data furnished by the officers of the Guaranty Company. The circulation of this prospectus amounted to 80,000 copies, and accompanying each copy was a map and application for subscription to stock; but neither Lawler nor Wells had any knowledge or information that this prospectus had been or was being circulated in England, or had any knowledge of its contents until some time in October, 1893. The further material facts are set forth in the opinion.

*Mr. M. F. Gallagher* and *Mr. G. W. Kretzinger* for appellants.

*Mr. William C. Scarritt* and *Mr. H. C. McDougal* for appellees. *Mr. E. L. Scarritt* was on the brief.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

The principal defendants to this suit are Lawler and Wells,

(hereinafter termed " the defendants ") and the case turns upon their complicity in and responsibility for the contents of the prospectuses, which are full of exaggerated and delusive statements, and were undoubtedly a gross fraud upon persons who took stock upon the faith of their exuberant promises. Indeed, they were of such a character as to create surprise that intelligent investors should have believed their statements to be true. The representation upon which the greatest reliance is placed is that contained in the American prospectus ; that " the titles are unquestionable, to the Seven Stars, Hillside, Happy Jack and other mines, being held under United States patents;" and in the English prospectus, that " the mines *owned by the company* are situated in the Eureka mining district, Yavapai County, Arizona," and that " the title is indefeasible, being United States patents to five claims, together with several locations as easements."

Attached to these prospectuses was a map entitled " Map of the group of mines belonging to the Seven Stars Gold Mining Company." It is true that there is neither in the prospectuses nor in the map a distinct assertion that the legal title to the properties mentioned was vested in the Seven Stars Company ; but we think that no one can read them without inferring and believing that the Seven Stars was the owner of these properties, and that the net proceeds of their operation would be distributed in dividends to stockholders. As they were circulated as an inducement to take stock in the enterprises, we are bound to interpret them by the effect they would produce upon an ordinary mind. *Andrews* v. *Mockford*, (1896) 1 Q. B. D. 372. They were, however, even more damaging in their omissions than in their statements. No mention was made of the fact that the title to these properties stood in the names of Lawler and Wells ; no allusion to the Cowland agreement, with its provisions for forfeiture, nor to the fact that the only interest of the company was an equitable right to the properties after the sum of $450,000 had been realized from the profits and paid to defendants. In estimating the probability of subscribers being misled by these prospectuses we may take into consideration not only the facts stated, but the facts suppressed. *New Bruns-*

*wick &c. Co.* v. *Muggeridge,* 1 Drewry & Smale, 363. They are entitled to know the *cons* as well as the *pros.* *Gluckstein* v. *Barnes,* (1900) App. Cas. 240; *Hubbard* v. *Weare,* 79 Iowa, 678; *Hayward* v. *Leeson,* 176 Massachusetts, 310; *In re Leeds and Hanley Theatres,* (1902) 2 Ch. Div. 809.

It does not appear, however, that these defendants were promoters or interested in the organization of the Guaranty Company, or the Seven Stars Company, or in the sale of the capital stock of such companies, although they knew that Warner's intention was to incorporate a company, and, to use the language of one of the defendants, " work it for all there was in it." As they were not concerned in the methods used to procure subscriptions to stock, or in the statements made in the prospectuses, it is difficult to see how they can be held responsible, unless they are made so by the fact that they knew and connived in the misstatements as to the title of the company. But while they might have known that the prospectuses were being issued, they were under no obligation to read them or contradict their exaggerated statements and promises. In their agreement with Cowland they had stipulated that he, or his assignee, should explore, work and operate the property, and they could not have failed to know that this would be done through a company organized for that purpose. Such company would be authorized to issue prospectuses and obtain subscriptions to stock as best it could, and clearly defendants were not bound to supervise its methods in doing so, or render themselves responsible for statements made by the company, provided they did not indorse them. There were no relations between them and the purchasers of the capital stock, and no duty on their part to interfere with the circulation and distribution of the prospectuses and maps, or to inform the subscribers personally that they were the owners of the legal title to the property. They had the right to rely, so far as respected these companies and their stockholders, upon the fact that their title was of record, and was notice of their rights to every one who contemplated taking stock in the company.

The testimony bearing upon the complicity of Lawler and Wells with the preparation of these prospectuses and maps is

such as amounts rather to a suspicion that they may have known and approved of their contents, than to positive proof that they received · their indorsement.   Of course, if it were shown that they were put forth by them personally ·with· knowledge upon their part of their contents, and of the falsity of their statements, and that they were issued as a basis of obtaining subscriptions to stock, they would be justly held liable as participants in the fraud ; but the mere fact that they turned over the organization of the company to other parties who would pursue the usual course of issuing prospectuses for the purpose of raising subscriptions, would not, of itself, charge them with the duty of examining and verifying their statements.

The facts principally relied upon are that the defendants caused to be delivered to Mr. Rickard, an agent of Cowland, a report previously made upon the mines, known as the Blauvelt report, together with a map of the underground workings of the mines, known as the Blauvelt map, as well as copies of the smelter and milling returns of ores shipped from the mines, known as the " smelters' returns."   It is not found, however, that these documents were false in any particular, except the map, which was prepared by one Brodie, without the knowledge of the defendants, but was seen by defendant Lawler hanging in the office of the· companies in New York, and was entitled " Plat of the Hillside and adjoining claims," although it appears that afterwards, without the knowledge of Lawler, these entitling words were changed, before the maps were distributed, to the words " Map of group of mines belonging to the Seven Stars Gold Mining Company."   It thus appears that when Lawler saw this map it contained no words indicative of ownership in the Seven Stars Company.   It also appeared that in August of the same year defendant Wells visited the office of the Guaranty Company in New York, and while there had an interview with Warner, président of both companies; but the evidence does not show that anything was said to Wells about the plans of the companies, or the issue and circulation of a prospectus ; although Lawler became aware of the fact that the prospectus was being prepared for circulation, and for the

purpose of promoting the sale of the stock of the company, and that the Blauvelt report and map were being used in connection with it.

In October, 1892, Warner represented to the defendants that he was unable to place the securities he held, in time to meet the payment of that portion of the price falling due November 12, and relying upon his representations and requests defendants agreed to an extension of the time; but on May 8, 1893, the whole scheme so far as Warner was connected with it, collapsed, by his executing a general assignment of his property for the benefit of his creditors. Defendants, learning of this, made a further agreement with Cowland, extending the time for payment under his agreement, receiving as part of the consideration $50,000 par value of the guaranteed capital stock of the Seven Stars Company, and the appointment of Lawler as manager of the mines. In May, 1893, Lawler received notice in writing that remittances on account of the Cowland contract were being made from money derived from the sale of stock of the Seven Stars Company, and in August, 1893, the Chancery Court of New Jersey, in which State the company was incorporated, appointed defendant Griffin receiver of both companies. In September, defendants, as owners of the legal title, and exercising their rights under the original escrow agreement, entered into possession of the group of mines and remained in exclusive possession until September, 1897, when a receiver was appointed by an Arizona court.

The most important item of testimony, and one which lies at the basis of this suit, is the fact that the defendants received from the proceeds of the mines, during their operation by the Seven Stars Company, sums aggregating $47,812.25, and also received from Warner and others, on account of the purchase price of the property, $112,339.96. This, however, they had a perfect right to do under their contract, unless they were distinctly apprised of the fact that it was fraudulently procured. But the prospectus, map and application were prepared under the supervision of Warner, and the documents framed in accordance with his views. The evidence tends to show that while defendants had knowledge of the preparation and circulation of the prospectus

and maps, knowledge of the statements and representations contained in them is not brought home to them, nor were they bound to inform themselves as to their contents.

There are further findings that defendants, in October, 1892, became aware that the American prospectus was being distributed by the Guaranty Company, and that they did not at any time protest against its preparation or circulation, or in any way give notice of their rights in the mines to any of the purchasers of the stock of the Seven Stars Company, except as such notice might be imputed to them through the record title in defendants. But it is further found that they did not at the time the subscriptions to the stock were being made, make any representations or communications to any subscriber to said stock; nor did they have any notice or knowledge that any moneys received by them on account of the purchase price formed a part of the money raised from subscriptions to stock and paid to the Guaranty Company on account of the purchase price—at least not until May 20, 1893, when nearly all the payments had been made. Neither were they interested as promoters or otherwise in the organization of either of the corporations, or in the issue or circulation of the prospectuses, or the sale of the capital stock.

Were they bound to refuse the money when it was tendered them? Even if defendants had knowledge or notice that payments received by them on account of the purchase price were made from moneys raised from subscriptions to stock, there was no impropriety in receiving their money from the proceeds of the sales of the stock, although the contract specified only that they should be entitled to the proceeds of the ore mined. As they had agreed to sell their interests at $450,000, and Cowland had agreed to pay that amount, it may be assumed that this was the real value of the properties at that time. This amount defendants had a right to receive before they surrendered the deed of the properties, but how it was to be raised was no concern of theirs. Granting the provision in the contract for the forfeiture of all moneys paid, in case the sale finally fell through, to have been a harsh one, (and in fact it was much less harsh than it appeared to be,) it was fully un-

derstood and agreed upon by both parties; and while a bill in equity might not have lain to enforce it, it does not follow that defendants will be compelled to return the money unless they actively participated in the representations under which it was raised. The case would have been stronger if the Cowland agreement had provided distinctly that a mining company should be formed and defendants paid from the proceeds of sales of its stock, but the agreement made no provision how the money should be raised or from what fund it should.be paid, except that the proceeds of the operation of the mines and the ores should be at once paid to the defendants and be credited on the agreement. It was not provided, however, that this should be the only source from which the money should be raised.

As matter of fact, the Guaranty Company was engaged in promoting sundry mining and industrial enterprises, including the business of the Seven Stars Company; and during the time the payments were being made, it received and disbursed the sum of $824,142.13, which was deposited in its own name in a common fund in the Continental National Bank, and chequed out by the Guaranty Company in its various business enterprises as required, and, amongst others, to the defendants on account of the Cowland agreement. These cheques, which were generally payable to Cowland, were collected by the payee, the money transmitted to the Bank of Arizona, and placed to the credit of defendants on account of the purchase price of the property. Between June 15, 1892, and September 18, 1893, the Guaranty Company paid out for operating expenses, purchase of machinery, purchase price of the Hillside group of mines, dividends and all other expenses, an aggregate sum of $380,295.81—over $100,000 more than the amount of money received from the sale of the Seven Stars guaranteed stock.

The case, then, comes to this: Whether the mere fact that defendants knew that a prospectus was to be issued; that they furnished the Blauvelt report, (not shown to be false,) to which was appended a map indicating (though not to their knowledge) that the mines belonged to the Seven Stars Company, and that

they might have informed themselves, if they had chosen to do so, of the contents of the prospectus, and did actually receive a large amount of money without knowing the source from which it came, render them liable as participants in the fraud perpetrated by the circulation of the prospectus?

Putting the case in the most favorable light for the plaintiffs, it was only a case of estoppel by silence. Indeed, it was not even an ordinary case of estoppel by silence, but an estoppel by silence concerning facts of which defendants may have had no actual knowledge. To constitute an estoppel by silence there must be something more than an opportunity to speak. There must be an obligation. This principle applies with peculiar force where the persons to whom notice should be given are unknown. So, too, to constitute an estoppel, either by express representation or by silence, there must not only be a duty to speak, but the purchase must have been made in reliance upon the conduct of the party sought to be estopped; and the express finding of the court in this case is "that the subscribers to the capital stock of the Seven Stars Company, in making their several subscriptions therefor and payments thereon, did so without any knowledge of, and without relying on, anything said or done, or omitted to be said or done, in the premises by the said Lawler and Wells, or either of them." Granting that if these subscribers had known all the defendants knew regarding the title to this property, they would not have subscribed to the stock of the company, it does not follow that defendants were bound to take active steps to inform the public of that which already appeared upon the record.

This case does not belong to that class of which *Gregg* v. *Von Phul,* 1 Wall. 274, is an example, wherein it was said that "if one has a claim against an estate and does not disclose it, but stands by and suffers the estate to be sold and improved, with knowledge that the title has been mistaken, he will not be allowed afterwards to assert his claim against the purchaser." Such cases are believed to be confined to those where the party's silence is inconsistent with the position subsequently assumed by him, as where he suffers land to be improved while holding an unrecorded deed of it. In this case, however, defendants' posi-

tion was perfectly consistent with their title of record and with the Cowland agreement, which distinctly provided that Cowland or his assignees should enter into possession, develop and work the mines upon their own account, though paying the proceeds to them.

But, conceding defendants to have been apprised of the contents of the prospectus, it would certainly be an exceptional case if a person holding a deed of property which he has placed upon record would be bound to disclose his title to a person contemplating purchasing or making improvements upon the land, or would be estopped from making his claim thereto by mere silence, since he has a right to rely upon the constructive notice given by the record; although the rule would be otherwise in case of positive misrepresentations upon his part. *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S. 326, 337; *Knouff* v. *Thompson*, 16 Pa. St. 357; *Brinckerhoff* v. *Lansing*, 4 Johns. Ch. 65; *Rice* v. *Dewey*, 54 Barb. 455; *Kingman* v. *Graham*, 51 Wisconsin, 232; *Sulphine* v. *Dunbar*, 55 Mississippi, 255; *Porter* v. *Wheeler*, 105 Alabama, 451. The authorities also recognize a distinction between mere silence and a deceptive silence accompanied by an intention to defraud, which amounts to a positive beguilement. *Sumner* v. *Seaton*, 47 N. J. Eq. 103; *Hill* v. *Epley*, 31 Pa. St. 331; *Markham* v. *O'Connor*, 52 Georgia, 183.

For instance, if a mortgagee stood by while a mortgagor was selling a piece of property to a person whom the mortgagee knew was purchasing the property upon the supposition that it was unencumbered, he might be estopped by his silence, even though his mortgage were of record. But upon the other hand, if he were merely informed that the mortgagor was endeavoring to sell the property as unencumbered, he would clearly be under no obligation to look up the purchaser, or to inform the public generally of the existence of the mortgage. In such case he might safely rely upon the record. No duty to speak arises from the mere fact that a man is aware that another may take an action prejudicial to himself if the real facts are not disclosed. *Sullivan* v. *Davis*, 29 Kansas, 28. As stated by Bigelow on Estoppel, 5th ed., page 596: "So long as he is not brought in contact with the person about to act, and does

not know who that person may be, he is under no obligation to seek him out, or to stop a transaction which is not due to his own conduct, as the natural and obvious result of it." It cannot be that A would be estopped by silence with respect to his title to property which B is about to purchase, when he has no knowledge that B contemplates buying and B has no knowledge that A is connected with the property. We know of no case holding that a man is estopped by silence as against the public, or any particular person with whom he has no fiduciary relation. It was said by the Court of Appeals of New York in *Viele* v. *Judson*, 82 N. Y. 32, 40, of the cases holding a party to be estopped by his silence: " In all of them the silence operated as a fraud and actually itself misled. In all there was both the specific opportunity and apparent duty to speak. And, in all, the party maintaining silence knew that some one else was relying upon that silence, and either acting or about to act as he would not have done had the truth been told. These elements are essential to create a duty to speak."

Before holding that defendants are liable by reason of their silence it ought to be made to appear what action they could have taken to prevent the perpetration of the fraud embodied in the prospectus and maps. If they had actually participated in it by circulating these documents, or representing them to be true, the case would have been different; but if they be held at all it must be by reason of their silence and inaction, when it is not even shown that they were cognizant of the statements contained in them. They may have seen them, but they were not bound to read them, or inform themselves of the truth of their statements, since they were no party to them in any way whatever, and were interested only in obtaining payment for their property. But conceding that they were fully apprised of their contents, what action were they bound to have taken? They could not give notice to the hundreds of thousands to whom the prospectuses were sent, since they were not even apprised of their names or addresses. A notice to the company not to send out these prospectuses would have been equally futile, in case the directors chose to disre-

gard it, since they could not control their action, nor could they have sustained a bill for injunction, since they could have shown no personal injury to themselves by reason of the action of the promoters.

The difficulty of doing exact justice to the plaintiffs in this case, without also doing an injustice to the defendants, suggests another reason why they should not be charged with liability for the circulation of this prospectus and map without clear proof of their complicity. At the time of the sale of these mining properties their real value must have been unknown. If the mines proved successful they may have been worth millions; if unsuccessful, they would be of little value—perhaps worthless. The amount agreed upon, $450,000, was one which the defendants were willing to take as a compromise, and one which the plaintiffs were willing to pay as a speculation. Each party to the sale took his own chances, and no complaint is made of unfair dealing on either side. In their cross complaint defendants tendered to the court and offered to deliver the deed and possession of the mines upon the payment of the residue due them under the escrow agreement. If the property be now more valuable than the amount agreed to be paid, no reason is apparent why the tender should not have been accepted. If, as appears to be more probable, it is of less value, or wholly valueless, the defendants in refunding the amount paid would not only lose that amount, but all possibility of reselling the mines to other parties, and would thereby assume the risk of an unfortunate speculation, which the whole design of the sale was to impose upon the purchasers under the Cowland agreement, namely, the plaintiffs. In making the purchase the vendees were willing to assume the risk of the mines proving unsuccessful. The vendors were evidently unwilling to take this risk, and preferred to take a sum certain for their speculative chances. Assuming that in equity the defendants could be called upon to refund the money paid, it seems unjust that they should also be saddled with the burden of an unfortunate speculation. In short, the circumstances have so changed that justice cannot be done without imposing damages upon the defendants which were not within the contemplation of the parties.

· If the first alternative prayer of the bill were granted, and it were adjudged that the defendants were estopped from asserting that the Seven Stars Company was not the owner of the mining properties, and adjudging such company to have full title thereto, and that defendants should also repay all the proceeds of ore taken therefrom and received by them, amounting to $47,812.25, it will result that of the $450,000, agreed upon as the price of the property, they would have received but $112,339.96, and would lose $337,660.04, of the amount agreed to be paid. Upon the other hand, if the second alternative prayer were granted, and defendants were adjudged to return the money found due in the first decree of the District Court, namely, $180,139.82, and retake the property, which now appears to be of little value, they would be practically, in either case charged with the entire burden of the venture which it was the express object of the Cowland agreement to avoid. A decree that would bring about this result would savor of punishment to defendants rather than of compensation to plaintiff.

We think the plaintiffs have wholly failed to make out such a complicity on the part of the defendants, with the preparation and circulation of these prospectuses, as would make them liable for the losses which the plaintiffs have doubtless sustained.

The decree of the court below is, therefore,

*Affirmed.*