### No. 25,548.

JOHN W. MURRAY and HAROLD F. HANES, *Appellees*, v. J. H. CLOSE, OSCAR BONNETT and JOHN E. BARRETT, *Appellants*.

#### SYLLABUS BY THE COURT.

JOINT ADVENTURE—*Oil and Gas Lease—Conspiracy—Evidence—Special Findings*. In an action to recover on account of alleged fraud and conspiracy in the sale of an oil and gas lease, the proceedings considered, and *held*, (*a*) the evidence was not sufficient to sustain the judgment; (*b*) the special findings of the jury required a judgment in favor of the defendants; (*c*) the defendant Close was entitled to recover on his cross-petition.

Appeal from Miami district court; JABEZ O. RANKIN, judge. Opinion filed March 7, 1925. Reversed.

*Frank M. Sheridan, B. L. Sheridan,* both of Paola, *A. M. Harvey, Randal C. Harvey,* and *Paul L. Harvey,* all of Topeka, for the appellants.

*Karl V. Shawver,* of Paola, *Charles Reagh,* of Chicago, Ill., and *M. L. Corey,* of Washington, D. C., for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover on account of fraud and conspiracy in the sale of an oil and gas lease. The plaintiffs prevailed, and defendants appeal.

The facts were substantially as follows: In January, 1920, J. H. Close, Robert Stone, John E. Barrett and Oscar Bonnett, Topeka parties, purchased an oil and gas lease in Miami county for $45,000, from one Tedlock. They paid $16,000 cash and were to pay $29,000 in March following. The lease contained 180 acres and had on it seven completed wells, with room altogether for sixty. The Topeka parties listed the lease for sale with several brokers, one of whom was Thomas P. Fry, of Wichita. Fry conducted negotiations with a number of prospective purchasers, and later (March 26) procured a written option for the exclusive right to purchase the lease for $100,000. Fry agreed to pay $4,000 for the option, and actually paid $3,200. The option was to terminate April 26. At the time of making the option agreement it was also agreed that the Topeka

parties would pay Fry $11,000 or 20 per cent of the profit if he sold the lease for $100,000. Negotiations with various parties were carried on by Fry and various plans considered for operating the lease, of which the Topeka parties appear not to have been cognizant.

After securing his option, Fry took in three other parties—McClatchey, Beach and Shaufler—with the understanding that they were to help him pay the $4,000, which he had agreed to pay for the option, and that they were to help him sell the lease or take over property; this was without the knowledge of the Topeka parties. Murray lived in Detroit and at that time was making investments in Kansas through Hanes and one Frank Lunny. Hanes was experienced in the oil business. Murray had been associated with him in various operations. Hanes, Murray and Lunny became acquainted with Shaufler and began negotiations for the lease in question. Oil was $3.50 per barrel. The Prairie pipe line was being built toward the field and indications were that the lease was valuable. After personally investigating the lease, Hanes and Lunny, by prearrangement, went to Chicago, for conference with Murray, and on April 2, Murray returned and made an inspection of the lease. During the inspection it was suggested that a test be made of one of the wells, and it was agreed that Fry should make the test. Fry made the test and reported. The Topeka parties were advised that a deal disposing of the lease might be closed at Osawatomie on April 23, 1920, and defendant Close went to Osawatomie at that time for that purpose. When Close arrived at Osawatomie he learned the property was to be paid for by checks drawn by John W. Murray and were payable on banks at Detroit. He received checks for $100,000 and deposited them for collection. He also placed an assignment conveying the lease to F. A. Beach, E. H. Shaufler and H. F. Hanes and other title papers with a bank at Osawatomie, to be delivered when the checks cleared. Fry informed him that he desired the money that was due him, to be distributed by the payment of $2,500 to McClatchey, $3,500 to Shaufler, $3,500 to Beach, and $4,700 to himself. This covered the $11,000 commission due to Fry, together with the sum of $3,200 that had been paid by Fry for his option. Upon receiving word that the Murray checks had cleared, Close, on April 29, made distribution by paying the money due to Fry in the manner indicated, and by paying Tedlock the amount still due upon the original purchase from him.

The purchasers of the lease had considered various plans under which they would take title and operate it. After consideration, it was determined that, instead of handling it through a corporation, it should be handled through a trust agreement, and Beach, Shaufler and Hanes were named as trustees for that purpose. The property was to be owned by the following persons and in the proportions named: Murray 16 per cent, Hanes 28 per cent, Lunny 16 per cent, Fry 10 per cent, Beach 10 per cent, Shaufler 10 per cent, and McClatchey 10 per cent. And, according to the agreement among them, Murray was to get back the money he advanced ($100,000) out of the first money produced by the lease.

The purchasers went into possession of the lease, drilled twenty additional wells, and connected with a pipe line which reached the lease in July of the same year.

A number of months later an action was filed by Close and Fry against Murray, Hanes and others in Miami county, involving other transactions. Following the filing of that action, Murray and Hanes filed one in the federal court against the present appellants and others, to restrain prosecution of the Miami county case and to recover on the same matters that are here in controversy. The Miami county case was disposed of during the pendency of the case in federal court. The federal court action was later disposed of by a certain settlement evidenced by a stipulation, and by dismissal of another cause of action, both of which require consideration here.

The controversy over the stipulation referred to is involved chiefly in a cross-petition filed by Close. The issues arising in connection therewith were tried by the court and decided adversely to the contentions of Close. On the other issues, which were tried to a jury, the plaintiffs were awarded a verdict of $11,000. The jury also answered special questions as follows:

"Q. 1. Did the leases in question, known as the Hopkins-Cunningham leases, have an ascertainable market value on the 23d day of April, 1920? And, if so, what was such market value? Answer. No.

"Q. 2. What was the actual value of the Hopkins-Cunningham leases on the 23d day of April, 1920? Answer. $89,000.

"Q. 3. What would the value of the Hopkins-Cunningham leases have been on the 23 day of April, 1920, if the same had been as represented to plaintiff? Answer. $89,000.

"Q. 4. Did the defendant, J. H. Close, know when he received the $100,000 at Osawatomie on April 23, 1920, that plaintiff Murray was interested with plaintiff Hanes and F. A. Beach, E. H. Shaufler, R. L. McClatchey, Thomas P. Fry and Frank Lunny in the purchase of said lease? Answer. A part of them; not necessarily all.

"Q. 5. State whether or not you find that John E. Barrett knew at, or before, the time when he received his share of the moneys he derived from the sale of the Hopkins-Cunningham leases, that F. A. Beach, E. H. Shaufler and Harold F. Hanes were trustees? Answer. Yes.

"Q. 6. State whether or not you find that Oscar Bonnett knew at, or before, the time when he received his share of the moneys he derived from the sale of the Hopkins-Cunningham leases, that F. A. Beach, E. H. Shaufler and Harold F. Hanes were trustees? Answer. Yes."

It is first contended by the defendants that the evidence was not sufficient to sustain the judgment. The plaintiffs, among other things, had alleged that, "If said leases had been as represented they would have been worth $300,000, while their actual value was only $3,000, and that therefore on this cause of action the plaintiffs pray judgment for $297,000." Fry's report of the test which he had made formed the basis of the alleged misrepresentations and fraud. It is not necessary to analyze the evidence in this connection, for the reason that the jury found in the second and third findings that the value of the leases was as represented.

The defendants contend that the court should have sustained their motion for judgment upon the special findings of the jury. On the other hand, the plaintiffs claim that the second and third counts of their petition charged bribery and that both were sustained by the evidence. They argue that the fraud consisted of a bribery, for which the defendants became paymasters. Their contention, as we understand it, is not bribery in the ordinary sense of that term, but that there was a concealment of facts which should have been disclosed; that they should have been advised of the distribution of the funds by Close, as directed by Fry; that such payment was a bribery of McClatchey, Beach and Shaufler, who were interested with Fry in the sale of the lease, and all of whom retained an interest therein when the lease was sold.

Fry, McClatchey, Beach and Shaufler were promoting the lease. It was their intention to operate it in the event of no sale. Murray and Hanes learned of the lease, personally investigated it, and decided to purchase. Fry, McClatchey, Beach and Shaufler were within their rights in selling the entire lease, or a portion of it, to Murray and Hanes. In so doing it cannot be said that they were dealing other than at arm's length.

In *Withroder v. Elmore*, 106 Kan. 448, 188 Pac. 428, it was said:

"Where one buys a piece of property on his own account and thereafter sells interests in it to different persons in pursuance of a plan to form an associa-

tion to handle it, in making such sales he occupies no fiduciary relation to the prospective purchasers, and is not bound to inform them what the property cost him, or to refrain from charging them more than a proportionate part of what he had paid for it." (Syl.)

This language is found in the opinion:

"In such a situation as that here presented the relation of the parties are as declared in the course of an opinion, the following portion of which has been often quoted with approval by courts and text writers: 'Any man or number of men, who are the owners of any kind of property, real or personal, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent misrepresentation made by the vendors to their associates. They are not bound to disclose the profits which they may realize by the transaction. They were in no sense agents or trustees in the original purchase, and it follows that there is no confidential relation between the parties which affects them with any trust. It is like any other case of vendor and vendee. They deal at arm's length. Their partners are in no better position than strangers. They must exercise their own judgment as to the value of what they buy.' (*Densmore Oil Co. v. Densmore,* 64 Pa. St. 43, 49, 50, quoted in 1 Fletcher's Cyclopedia Corporations, § 138, p. 291, and in cases there cited; also in Elliott on Private Corporations, 4th ed., § 54, and 1 Clark and Marshall's Private Corporations, § 110*b,* p. 330.)" (p. 450.)

When plaintiffs had decided they would purchase the lease, careful consideration was given to the manner in which the property would be handled—whether through a corporation or otherwise. It was determined to handle it under the provisions of a common-law trust, and Hanes, Beach and Shaufler were named as trustees to hold the legal title to the property and carry on the operations for the association. The fact that they were so named did not constitute them trustees for Murray and Hanes in the purchase of the property. It is conceivable that an entirely different situation might have arisen had Beach and Shaufler, in the first instance, been acting for Murray and Hanes in the purchase. This, however, they were not doing.

In view of the fact that the jury found that no misrepresentations were made in the sale of the lease, it is difficult to see how the plaintiffs were injured by Fry making a division of his commission with the other parties. There was no question but that Fry, under his contract with the Topeka parties, was entitled to a commission in the event he was able to dispose of the lease, and it could make no possible difference to the plaintiffs whether the commission was paid to Fry, or divided by him among the others who had interested themselves with him.

The rule announced in *Withroder v. Elmore,* supra, appears to be of general application. (See 1 Fletcher's Cyclopedia Corporations, § 138, and various cases there cited; see, also, *Wiser v. Lawler,* 189 U. S. 260.)

The jury, in answer to the fifth and sixth questions, found that Bonnett and Barrett knew that Beach, Shaufler and Hanes were trustees. They were trustees, but not for the purpose of buying the lease for the plaintiffs, and cannot be said to have been under any obligation to the plaintiffs in connection with such purchase. They were trustees for the purpose of holding the legal title to the lease and operating it for the association after the purchase. Beach and Shaufler acquired their interest in the property long prior to their association with Murray and Hanes and were under no disability to join with other parties in taking over the property without disclosing the terms by which they acquired their interests.

Defendant Close contends that his set-off showed a liability on the part of the plaintiffs in an amount greater than the damages found in the general verdict of the jury, and that for this reason no judgment should have been entered against any of the defendants. The facts in connection therewith are substantially as follows:

December 6, 1920, Close and Fry sued Murray and Hanes in Miami county on a note. Attachment and restraining orders were issued and served. On January 7, 1921, Murray and Hanes filed action in the federal court to compel Close and Fry to pay the note. March 15, 1921, Close and Fry stipulated with Murray and Hanes in the federal court suit to try the issues as to the note and matters incident thereto in the federal court separate from the general charge of fraud and to release attachments and restraining orders in the Miami county case. On July 13, 1921, Close and Fry stipulated with Murray and Hanes in the federal court as to all of the issues involving liability on the note, and by this stipulation Murray and Hanes agreed to hold Close and Fry harmless as against the note, and that rendition of judgment against Close and Fry or either of them should be deemed a breach of the stipulation on the part of Murray and Hanes. The relevant part of the stipulation reads:

"Plaintiffs, J. W. Murray and Harold F. Hanes hereby covenant and agree to and with the said Thos. P. Fry and J. H. Close that the said plaintiffs will hold the said Thos. P. Fry and J. H. Close harmless as against a certain note of $16,235, executed by J. W. Murray, F. A. Beach, E. H. Shaufler, J. H. Close and Thos. P. Fry, dated September 20, 1920, due 60 days with 8 per cent

Murray v. Close.

interest, payable to J. E. Tedlock, and which the parties hereto understand is now owned by the Farmers and Mechanics Bank of Osawatomie, and all renewals of said note, if any have been made, which note is referred to in said bill of complaint; and rendition of judgment in adversary proceedings against said Close and Fry, or either of them, on account of said note, shall be deemed a breach of this covenant; and in event of any suit being brought against said Fry and Close, or either of them, upon or on account of said note, by the owners or holders thereof or anyone claiming any interest therein at any time hereafter, then upon notice of such suit or suits to said Murray or Hanes, or either of them, they shall defend said action or actions at their expense and pay any final judgment rendered therein against either said Fry or Close or both of them."

All of the terms of the stipulation that could be complied with at once were executed. Close and Fry dismissed with prejudice their suit in Miami county and a cross bill they had filed in the federal court. It appears, however, that Murray and Hanes failed to protect Close against the note, and judgment was entered against him for the face of the note and interest, in the sum of $17,625. Murray and Hanes refuse to pay the judgment or in any way to hold Close harmless against it. They contend that Close is not harmed and has no cause of action against them in this regard until he is compelled to pay the judgment.

Murray and Hanes agreed in their stipulation to hold Close harmless on the note. They have not done so, and their failure to keep their contract in this regard gives Close a cause of action against them—a cause of action that accrued immediately on the rendition of judgment against Close. Close, however, is asking no affirmative relief.

The plaintiffs failed to sustain their charge of fraud and conspiracy, and judgment should have been rendered against them for that reason; also on the special findings.

The judgment is reversed and the cause remanded with instructions to render judgment against the plaintiffs for costs.

HARVEY, J., not sitting.