### CALIFORNIA PACKING CORPORATION v. SUN–MAID RAISIN GROWERS OF CALIFORNIA.*

No. 7701.

Circuit Court of Appeals, Ninth Circuit.

Feb. 3, 1936.

*Writ of certiorari denied 56 S. Ct. ——, 80 L. Ed. ——.

F. D. Madison, Marshall P. Madison, and Leland B. Groezinger, all of San Francisco, Cal. (Pillsbury, Madison & Sutro, of San Francisco, Cal., of counsel), for appellant.

Edward S. Rogers, of Chicago, Ill., and A. W. Boyken, of San Francisco, Cal. (Miller & Boyken, of San Francisco, Cal., of counsel), for appellee.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

The appellant brought this action to enjoin the appellee from using the trade-mark "Sun-Maid" otherwise than on packages containing raisins or food products or confections made wholly or in part from raisins. The controversy grows out of the claim by the complainant and its predecessors that the trade-mark "Sun-Maid" used by the defendant and its predecessors infringed the trade-mark "Sun-Kist," which is used by the appellant. The controversy was first brought to the attention of the courts on June 21, 1915, by an action begun by J. K. Armsby Company, appellant's predecessor, against the California Associated Raisin Company, appellee's predecessor, wherein J. K. Armsby sought to enjoin the use of the trade-mark "Sun-Maid" on raisins because of its prior use of the term "Sun-Kist" for the same purpose. The parties settled that litigation by contract dated March 10, 1917.

The appellant, having succeeded to the rights of J. K. Armsby Company to the use of the trade-mark "Sun-Kist," joined that company in the contract, and Griffin & Skelley Company, a raisin packing company, California Fruit Canners' Association, and the California Associated Raisin Company, joined therein. Under the terms of this contract it was agreed that the California Associated Raisin Company would refrain from the use of the trade-mark "Sun-Maid" on all products other than raisins and food products or confections containing raisins. The appellee, Sun-Maid Raisin Growers of California, was not a party to this contract, but it has acquired the rights of the California Associated Raisin Company, which was a party to the contract, to the use of the trade-mark "Sun-Maid."

■■ The primary question in the case is whether or not the appellee Sun-Maid Raisin Growers of California is bound by the contract of March 10, 1917. The California Associated Raisin Company changed its name to "Sun-Maid Raisin Growers" on February 17, 1922. In the fall of 1923 it was found that the Sun-Maid Raisin Growers would have to terminate its business and dispose of its assets and the appellee was organized for the purpose of taking over the raisin packing business. Consequently, on August 1, 1923, a contract was entered into between the Sun-Maid Raisin Growers and the appellee by which, among other things, it agreed to transfer its raisin packing business and the good will thereof, together with its applicable trade-marks. On June 3, 1924, after the execution of this contract, the Sun-Maid Raisin Growers was adjudged bankrupt, and in the bankruptcy proceedings its assets, including the trade-mark "Sun-Maid," were transferred to the appellee by the trustee in pursuance of the agreement theretofore entered into between the Sun-Maid Raisin Growers and the appellee. The appellee claims that it had no knowledge of the agreement of March 10, 1917, and is not bound thereby, and that the agreements contained in that contract to be performed on behalf of its predecessor are covenants which do not run with the personal property assigned and are binding only on the parties to the contract. This contention overlooks the character of the trade-mark and the right to its use. The California Associated Raisin Company, under its own name, the Sun-Maid Raisin Growers, could not convey any right to the use of a trade-mark which it did not own, and that right had been expressly limited by the agreement of March 10, 1917, wherein the parties had agreed to limit the use of that trade-mark to raisins and raisin products. Consequently, the trustee in bankruptcy sold that right and no other. By its agreement to refrain from using the trade-mark "Sun-Maid" on any other than raisin products, it acquired the unquestioned right, so far as the parties here involved were concerned, to the use of that trade-mark on raisin products. The contract of settlement of the divers claims of the parties to the use of the trade-marks "Sun-Maid" and "Sun-Kist" was based upon mutual concessions as to doubtful claims. The appellee has enjoyed the fruits of that contract ever since it was executed and has packed nearly $250,000,000 worth of raisin products under the trade-mark "Sun-Maid." The appellee having purchased the rights of

one of the parties to the contract of March 10, 1917, cannot avoid the corresponding burden. We quote in support of this rule a statement from 15 C.J. 518, as follows: "The ordinary rules of construction apply to assignments and contracts affecting trade-mark rights. Successors or assignees are entitled to the same rights as the original proprietor, and the assignee of a trade-mark is subject to the same defenses that could be asserted against the assignor." This rule has been applied by the courts in analogous cases. In Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co. (C.C.A.) 63 F. 438, 442, the plaintiff sought an injunction to restrain the defendant from using the word "Hygeia" as a trade-mark for drinking waters except as specified in a contract between plaintiff's and defendant's predecessor. The defendant claimed, as is claimed by appellee in this case, that it was a bona fide purchaser from the predecessor. The court stated: "The purchase was not of the character which protects the buyer from equities existing against the seller. * * * No larger claim can be maintained than was possessed by the source of title, and the right is subject to the same equities, abandonment, or estoppel which could be asserted against the vendor." It is true that in that case the court also held that because of the fact that the two different trade-marks were in constant use, there was notice by the defendant company of the conditions existing under the contract. Pratt v. Wilcox Manufacturing Co. (C.C.) 64 F. 589, 592, a suit for infringement of letters patent, involved the same question. The plaintiff's predecessors had contracted with the defendants that each party should not interfere in the manufacture of the inventions set forth in their respective patents. Subsequently plaintiff's predecessor entered into an agreement with one Pratt under which he was given the exclusive rights to certain patents owned by Pratt. These patents of Pratt were infringed by the defendant's patents, which plaintiff's predecessor had contracted to protect. The plaintiff's predecessor merged into the plaintiff company and then brought suit against the defendants for the infringement of the Pratt patents, thus in effect attacking the very patents that plaintiff's predecessor had contracted to respect and protect. The court in applying the rule as to benefits and burdens said: "In the hands of the firm [E. C. Stearns & Co.] that assignment and right under the Pratt patent was burdened with the obligation of their contract with the Wilcox Manufacturing Company, and the complainant corporation took whatever it acquired from the firm of E. C. Stearns & Co., cum onere. I am therefore of the opinion, without inquiring into the subject of the validity of the patent, or the novelty of the invention, or the question of infringement by the defendant, that the complainants cannot maintain their suit, and the bill will therefore be dismissed."

The cases cited by the appellee, the Armstrong Co. v. Shell Co. of Cal., 98 Cal.App. 769, 277 P. 887, and Bryant v. Smith, 57 Cal.App. 214, 206 P. 1025, also recognize that a party who enjoys the benefits of a contract must bear its burdens. Bradford Belting Co. v. Kisinger-Ison Co. (C.C.A.) 113 F. 811, holds that an assignee is not bound to perform an independent covenant of his assignor, a question not involved in the application of the rule we are discussing in the case at bar.

The lower court found that the appellee acquired the business, good will, and trade-mark "Sun-Maid" from the Sun-Maid Raisin Growers in good faith and for a valuable consideration and without notice or knowledge of the contract of March 10, 1917. Consequently, appellee contends that it is not bound by that contract, and relies on the Federal Trade-Mark Act, § 10 (15 U.S.C.A. § 90), which authorizes the recordation of trade-mark assignments and provides that an assignment "shall be void as against any subsequent purchaser for a valuable consideration, without notice, unless it is recorded in the Patent Office within three months from date thereof." The failure to record the contract of March 10, 1917, did not open the door to a bona fide purchaser to question the validity of the contract, for that transaction was not an assignment by the appellant to the California Associated Raisin Company of the "Sun-Maid" trade-mark, but a contract limiting the right of the parties in their use of it.

What we have said disposes also of the appellee's contention that under the California statutory law (Cal.Civ.Code, §§ 655–663) a trade-mark is personal property, and that covenants do not run with transfers of personal property. The purpose and effect of the contract of March 10, 1917, was to define the relative rights

of each in its respective trade-marks. The appellee limited its right of ownership in the trade-mark "Sun-Maid" to the use of it in connection with raisins and raisin products. The contract so states. This view was adopted by the Court of Customs and Patent Appeals in litigation before that court between the parties hereto [California Packing Corporation v. Sun-Maid Raisin Growers of California (Cust.&Pat.App.) 64 F.(2d) 370, 373], where the appellant was contesting the right of the appellee to register the trade-mark "Sun-Maid" as to other than raisin products. That court held that the contract of March 10, 1917, gave the Sun-Maid Company only limited ownership in the trade-mark "Sun-Maid" and that it could not register the mark for any other product. The court said: "If an applicant has by contract divested himself of ownership of and the right to use a mark for which he makes application for registration, he is not the 'owner' of the mark. * * * Under the contract, appellee is not the owner of the mark, and was precluded from using the same as applied to such goods."

■■■ The appellee also contends that the contract of March 10, 1917, shows that there was no intention on the part of appellee's predecessor to bind its successors. In advancing this contention it relies upon the following provisions of the contract: "Provided, however, that nothing herein contained shall be construed to limit the right of the party of the first part to sell or assign said trade-mark, or to license other persons * * * to use the same to the extent to which the party of the first part has the right to use the same under this agreement. * * * *" Appellee's contention is that the contract is in the disjunctive and the phrase, "To the extent to which the party of the first part has the right to use the same," applies only in case of a license to other persons and does not limit the right of an assignee of the trade-mark.

There is nothing in the language of the contract to indicate that the appellee's predecessor was to have a right to convey the trade-mark free from the limitation of the contract. The fact that the contract was intended to settle the rights of the parties to the use of the trade-mark "Sun-Maid" necessarily involves the purpose of binding the successors of the parties thereto. Certainly

the appellee cannot accept an assignment of a contract without being bound by its limitations. Appellee also advances the contention that the contract of March 10, 1917, was not executed properly by the California Associated Raisin Company. The execution of the contract by the officers of the company who affixed the corporate seal is prima facie evidence that it was the act of the corporation. The pending action was dismissed, and the benefits of the contract were accepted by the appellee's predecessor and the contract was thus ratified. The validity of the contract cannot now be questioned. Owyhee Land & Irrig. Co. v. Tautphas (C.C.A.) 121 F. 343; Jacksonville, etc., Nav. Co. v. Hooper, 160 U.S. 514, 16 S.Ct. 379, 40 L.Ed. 515. The appellee contends that it has acquired the right to the use of the trade-mark on food products other than raisins by assignment from the San Joaquin Grocery Company. This assignment was made by the San Joaquin Grocery Company in 1924. The appellee had opposed the application of the San Joaquin Grocery Company for the registration of the trade-mark "Sun-Maid," and as a result the assignment was made, but after the assignment it continued to sell the same products under other trade-names. A manufacturer cannot make a valid assignment of a trade-mark and continue the manufacture or sale of the same products in connection with which the trade-mark was used. Eiseman v. Schiffer (C.C.) 157 F. 473; Independent Baking Powder Co. v. Boorman (C.C.) 175 F. 448.

■ Appellee contends that it has acquired the right to the use of the trade-mark "Sun-Maid" on other than raisin products by reason of its continued use thereof for such purposes. This contention is based in part upon the findings of the trial court that the trade-marks "Sun-Maid" and "Sun-Kist" do not infringe, and the owner of a trade-mark has the right to extend its use to other products, as held in Del Monte Special Food Co. v. Cal. Packing Co. (C.C.A.) 34 F.(2d) 774. It is clear that if, as we have held, the appellee was bound by the contract of March 10, 1917, not to use its trade-mark "Sun-Maid" upon products other than raisin products, it could not acquire a right to do so in direct contravention of the terms of the contract. This question, however, is real-

ly significant only from the standpoint of laches and estoppel. The trial court held that the appellee was bound by the contract of March 10, 1917. We agree with this conclusion.

That court also held that the appellant was estopped from enjoining the appellee from using the trade-mark "Sun-Maid" in violation of the contract of March 10, 1917, because of its acquiescence in the unauthorized use of that trade-mark by the appellee for a long period of time, and for that reason denied appellant the relief prayed for. We now consider that question.

Appellee began the sale of dried prunes under the trade-mark "Sun-Maid" about October, 1926. The sales were relatively small in amount; for the years 1926 to 1929, inclusive, were $10,798. The trade-mark was not used by appellee on any products other than raisin products and prunes prior to January, 1929. On March 4, 1929, appellant notified appellee that it was violating the contract of March 10, 1917. It appears, however, that the California Associated Raisin Company, a party to the contract of March 10, 1917, registered the trade-mark "Sun-Maid" on April 30, 1918, for dried fruits, and on May 14, 1918, for raisins and dried fruit; that on January 6, 1925, appellee was issued a certificate of registration of the "Sun-Maid" trade-mark upon a variety of food products that did not contain raisins. In 1926 appellee advertised "Sun-Maid Prunes" in a trade journal. In view of the extensive business of both parties to the contract running into millions of dollars, the sale of "Sun-Maid" prunes prior to 1929 constituted at most a minor infringement of the trade-mark "Sun-Kist" and a minor breach of the contract of March 10, 1917. On January 1, 1929, appellee began a more extensive use of the trade-mark. On March 4th, less than two months thereafter, they were notified by the appellant that they were breaching the contract and infringing its rights to prevent the use of the trade-mark "Sun-Maid" on other than raisin products. Appellee's contention as to estoppel and waiver is that the silence of the appellant as to the use of the "Sun-Maid" trade-mark under the circumstances indicated constituted an estoppel. As stated by the Supreme Court in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618: "The vital principle

is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." Where the conduct relied upon to invoke the principle of estoppel is silence, it must appear that the party has remained silent when it is under duty to speak. Wiser v. Lawler, 189 U.S. 260, 23 S.Ct. 624, 47 L.Ed. 802. There is nothing in the conduct of the parties or within the knowledge of the appellant which placed it under the obligation to speak and in so doing to admonish the appellee that it was violating the rights of the appellant. So far as laches or estoppel is concerned, registration of the trade-mark "Sun-Maid" in the Patent Office did not estop appellant from asserting its right under the March 10th contract. In Traub Mfg. Co. v. R. Harris & Co., 53 F.(2d) 416, 417, a decision of the Court of Customs and Patent Appeals, the court correctly stated the rule as follows: "The fact that the appellant may have stood by and permitted the use and registration of similar marks by others upon goods of the same descriptive properties cannot be held to estop the appellant from now asserting any rights it may have against the application for registration now made by appellee." And the court in Patton Paint Co. v. Sunset Paint Co., 53 App.D.C. 351, 290 F. 326, 328, said: "No right of property is concluded by registration of a mark, and the parties affected are free to seek such relief as courts of law or equity may award." Nor is appellant estopped because it failed to present its claim under the contract of May 10, 1917, in the bankruptcy proceedings of 1924. It had no claim thereunder to anything that the bankrupt owned. It only claimed to own what the bankrupt did not own as to the use of the trade-mark "Sun-Maid." It is clear that there is no estoppel in the case at bar.

The principle of laches upon which the trial court also relied in dismissing the appeal is analogous to estoppel, but differs from it in that it is based upon failure of the party to act in the enforcement of its rights for such an unreasonable time that equity will no longer give heed to its request for action. It is analogous to the statute of limitations, and ordinarily equity follows the law in that regard and enforces the same pe-

riod of limitation, although in some instances it may decline to exercise jurisdiction where there has been a delay for a shorter period. In considering the question of laches it should be again remarked that the rights of the parties were definitely settled by contract entered into between the appellant and the predecessors of the appellee. There is no uncertainty about it. The conduct of the appellee was in direct violation of the express terms of the contract. Notice was given to the appellants of its breach of this contract within two months of the time when the appellant began to extend its application of the trade-mark in a way that seriously interfered with the contract. On principle there seems no room for the application of the doctrine of laches and no decision has been cited in which the doctrine of laches has been applied under similar circumstances. The decisions are to the contrary. In Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 145, 32 L.Ed. 526, plaintiff sought an injunction to restrain defendants from using a certain trade-mark on flour. Defendant had infringed the trade-mark for thirteen years without objection by plaintiff. The injunction was granted, the court stating: "Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long, and under such circumstances, as to defeat the right itself. * * * So far as the act complained of is completed, acquiescence may defeat the remedy on the principle applicable when action is taken on the strength of encouragement to do it; but so far as the act is in progress, and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to which the elements of an estoppel could rarely arise. At the same time, as it is in the exercise of discretionary jurisdiction that the doctrine of reasonable diligence is applied, and those who seek equity must do it, a court might hesitate as to the measure of relief, where the use by others for a long period, under assumed permission of the owner, had largely enhanced the reputation of a particular brand."

There was no such laches in the case at bar as would bar the right of the appellant from asserting its right to an injunction.

Decree reversed.