CHESTER H. ROTH CO., Inc. v.
ESQUIRE, Inc.

United States District Court
S. D. New York.

June 30, 1949.

Mock & Blum, New York City (Asher Blum and Alex Friedman, New York City, of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Bruce Bromley, Harold R. Medina, Jr., and Albert Rosenblum, New York City, of counsel), for defendant.

COXE, District Judge.

This is an action, commenced January 21, 1947, for a declaratory judgment determining the rights of the parties in the use of the word "Esquire" as a trade-mark.

The plaintiff is a New York corporation engaged in the manufacture and sale of men's socks under the name "Esquire"; it claims title to the mark in succession to Nickels & Lauber, Inc., a Pennsylvania corporation (hereinafter referred to as "Nickels & Lauber, (Pa.)", which obtained federal registration on May 15, 1923 of the word as a trade-mark for "hosiery, scarfs, neckties and mufflers". The defendant is a Delaware corporation engaged in the publication of a nationally known monthly magazine entitled "Esquire"; its predecessor registered the name on June 5, 1934 as a trade-mark for a "monthly magazine". Both registrations were made under the Trade-Mark Act of 1905, 33 Stat. 724, and the Nickels & Lauber registration was renewed as of May 15, 1943.

On July 21, 1938 a predecessor of the plaintiff entered into an agreement with a predecessor of the defendant relating to the separate and concurrent use of the mark by the respective parties. It is the contention of the plaintiff that this agreement is void for champerty and maintenance, as being against public policy, and for lack of consideration. The defendant, on the other hand, insists that plaintiff has not obtained good title to the mark, that the agreement has been breached by the plaintiff, and that the defendant is entitled to judgment against the plaintiff restraining any further use of the mark by it, together with damages.

Nickels & Lauber (Pa.) was organized in 1917, and in that year it commenced the manufacture and sale of high-quality men's full-fashioned socks, in Philadelphia. "Full-fashioned" socks are those which have a seam running along the bottom of the foot and up the back of the leg, and they ordinarily sell at higher prices than seamless socks of the same general grade. The name "Esquire" appears to have been adopted for the product in 1922. During the period from 1922 to 1938 the socks were nationally advertised as "Esquire Hose", both by Nickels & Lauber (Pa.) and by various retailers in different parts of the country, and there was a fair national distribution of the hose. In the Nickels & Lauber advertisements its name appeared as the manufacturer, but in none of the retailer advertisements did its name appear. The

name was always omitted from the boxes and labels. The advertisements generally contained a drawing of a man's head, referred to as a "Pickwickian" character.

The defendant is the successor of Esquire Publishing Company, which began the publication in May 1933 of a monthly magazine entitled "Esquire", with a subtitle or heading "The Magazine for Men". Originally the magazine dealt solely with men's fashions and was sold to men's stores and department stores with men's departments. Soon the editorial scope of the magazine was broadened to include pictures, cartoons, general articles, and comments on woman's wear, and the magazine was placed on sale on newstands and also sold by subscription. From 10% to 15% of the magazine was, however, always devoted to men's fashions. Manufacturers and merchandisers of both men's and women's apparel advertised in its columns, about half being concerns in the men's field.

The defendant and its predecessor have spent large sums in promotional expenses of all sorts, advertising the magazine and creating for its a reputation as a guide and authority on subjects concerning merchandise, services and customs of interest to men, which has resulted in increasing the net paid circulation of the magazine from about 150,000 in 1934 to a maximum of over 700,000 in 1944.

The defendant had no knowledge of the existence or use of the trade-mark "Esquire" by Nickels & Lauber (Pa.) until the end of 1934. In the summer of 1935 Mr. Nickels, the secretary of Nickels & Lauber (Pa.), approached defendant's officers and told them that the popularity of the Esquire magazine had been causing him trouble in the protection of his trade-mark, and suggested that they cooperate for the mutual protection of their respective rights. The result was that they entered into an agreement on December 31, 1935, which was substantially identical with the agreement of July 21, 1938, now under attack by plaintiff.

On July 7, 1938 Nickels & Lauber (Pa.) sold and assigned to Nickels & Lauber, Inc., a New York corporation (hereinafter referred to as "Nickels & Lauber (N. Y.)", for the sum of $46,351.22, its entire business, including its hosiery inventory, machinery, supplies, good-will, and the trademark "Esquire", and Nickels & Lauber (Pa.) was thereupon dissolved. Nickels & Lauber (N. Y.) was a wholly-owned subsidiary of Mock, Judson, Voehringer Company, and appears to have been organized for that purpose.

The Mock Company was a manufacturer of women's hosiery; it had a plant at Siler City, North Carolina, where it proposed to manufacture men's full-fashioned hosiery by mass production, selling the output through Nickels & Lauber (N. Y.). Mr. Nickels went with Mock to the plant at Siler City. The project, however, was not successful, and at the end of 1938 Nickels left and returned to Philadelphia and organized a new company, Nickels & Nickels, Inc., which resumed manufacturing and selling the same type of men's full-fashioned hosiery under the name of "Croydon".

In the meantime, the agreement of July 21, 1938 was executed. This agreement was between Nickels & Lauber (N. Y.) and Esquire-Coronet, Inc., a predecessor of defendant, which will be referred to as the defendant. The agreement refers to the 1935 agreement and recites that Nickels represents that, since June 1, 1922, it and its predecessor have continuously used the word "Esquire", in combination with an illustration (the Pickwickian character), as shown on certain labels attached, as a trade-mark for "men's hosiery, men's knitted neckties, men's scarfs and men's mufflers". It further recites that thereafter the defendant began to use, and has since continuously used, the word "Esquire" as a trade-mark for "a periodical issued by it, which from the very beginning assumed to be an authority upon and an interpreter of styles in men's wear, and to identify" the defendant and its periodical "as an authority upon and an interpreter of styles in men's wear, and also as a trade name for its business"; that since the appearance of the magazine, many persons have adopted and used the word "Esquire" as a trademark, style mark, or trade name, in connection with various articles and businesses, for the purpose of trading upon

and profiting by the good name, fame and reputation of the defendant and its magazine, as an authority in connection with articles of interest to men, which celebrity and reputation is identified by the word "Esquire", and that the acts of such persons also, in many cases, infringe the trade-mark rights of Nickels in its trade-mark, and give it a good cause of action for trade-mark infringement and unfair competition; that "it is to the interests of both parties that these unauthorized and unfair uses of the word 'Esquire' be enjoined"; and that the parties desire to co-operate for such purpose, and also "to define their respective rights in the word 'Esquire' as a trade-mark".

The pertinent requirements of the agreement are:

(1) Nickels agrees not to use its trade-mark "in any manner other than as shown on the labels, * * * to use said trade-mark solely and only in connection with men's hosiery, * * * men's knitted neckwear, men's scarfs and men's mufflers, * * * never to extend the use of its said trade-mark to any other articles or business, and never to use the word 'Esquire' as part of its corporate name", and "to use its best efforts to prevent any likelihood of confusion between its said products bearing its said trade-mark, and the products or services sold" by the defendant.

(2) Nickels agrees, upon request of the defendant, to file suits for an injunction, accounting and damages against any person using the word "Esquire", or any word confusingly similar thereto, as a trade-mark in connection with any article of men's wear, or as a name under which to do a men's wear business, and to file Patent Office proceedings to prevent the registration of "Esquire" for goods of the same class to which Nickels applies its trade-mark, or to cancel any registrations that may have been obtained, and the defendant agrees to pay all the costs of prosecuting such suits or proceedings, including any costs or damages that may be assessed against Nickels, and also including the fees of Nickels' attorneys, provided that the defendant shall have the right to select them.

(3) Inasmuch as Nickels used the word "Esquire", together with the (Pickwickian) illustration, for its products before the defendant began to use the word, the defendant agrees not to interfere with its use by Nickels upon its products in the manner shown by the labels, and Nickels agrees not to interfere with the right of the defendant "to use the word 'Esquire' as its corporate name, to identify itself as an authority in connection with articles of interest to men, as a trade-mark for its magazine, * * * and also in any manner to indicate that it approves, sponsors, vouches for or designs any articles of interest to men, including the articles upon which Nickels uses its said trade-mark".

(4) The agreement shall be binding upon the successors and assigns of the parties.

Defendant has corresponded with nearly 1000 alleged infringers of the trade-mark "Esquire", protesting against their use of the word, or has instituted proceedings in the Patent Office or in the courts. In about 700 cases these protests or proceedings were successful, resulting in discontinuance of the use of the word. Only 3 or 4 were unsuccessful. The others are still pending.

On December 20, 1938 the Mock Company sold to plaintiff all the capital stock of Nickels & Lauber (N.Y.) and an account receivable of $10,244.40 which it had against the latter, for the sum of $20,537.39, plus an additional amount of not less than $7,500 or more than $10,000, and warranted that Nickels & Lauber (N.Y.) had not abandoned the trade-mark. The balance sheet, annexed to the agreement, shows assets, exclusive of the trade-mark, consisting of accounts receivable of $19,273.88, merchandise and supplies inventories of $1,634.55, and liabilities of $371.04, exclusive of the account payable to Mock of $10,244.40.

Mock also agreed in the sales agreement not to sell to anyone, except plaintiff or its subsidiary, any full-fashioned men's hosiery until July 1, 1939, and plaintiff agreed to purchase from the Mock Company all its requirements of men's full-fashioned hosiery until that date. Under this ar-

rangement 26,000 dozen pairs were purchased. All this, together with the inventory which had been acquired in December 1938, was disposed of by the end of 1940, under the name of "Esquire". No more full-fashioned men's hosiery was thereafter manufactured or sold, but plaintiff then began to sell, under the name of "Esquire", seamless men's hosiery which was manufactured for it by an independent concern. These sales increased from about $165,000 in 1941 to about $2,000,000 in 1944, and in each year thereafter.

After 1938 Nickels & Lauber (N.Y.) was operated as "Nickels & Lauber Division" of plaintiff, selling only "Esquire" men's hosiery, until November 1946, when Nickels & Lauber (N.Y.) was merged into plaintiff, and the trade-mark, together with the good-will and business connected therewith, was formally assigned to plaintiff.

Plaintiff was originally only a mill selling agent, but by 1938 it became a finisher, taking the hosiery in the grey from the manufacturer, preparing it for the market, and selling it. It did not become a manufacturer until 1944, since which date it has been both a manufacturer and a distributor. After it acquired control of the "Esquire" trade-mark in December 1938 that mark was used for its best styles, colors and patterns. Today it is the only mark used by it on nationally advertised men's hosiery, and its sales of such hosiery constitute about half in dollar value of its total sales. It has never used the mark on anything but men's hosiery.

In every year after 1938 plaintiff sold men's hosiery under the name "Esquire" throughout the United States. The boxes, wrappers and labels used by Nickels & Lauber (N.Y.) were continued until they were re-designed in 1939 or 1940. The new labels were, except in color and the omission of the word "full-fashioned", similar in all respects to the original labels, both having the same style of lettering and containing a man's head, the Pickwickian character. Neither the old nor the new boxes, wrappers and labels disclosed the name of either plaintiff or Nickels & Lauber (N.Y.) as the manufacturer—in line with the custom of most manufacturers.

In September 1940 and May 1942 there were conferences, without result, between plaintiff's attorney and defendant's president with reference to the agreement of July 21, 1938 as it affected plaintiff's right to use the trade-mark, especially in its advertising, plaintiff's attorney insisting that plaintiff had the right to advertise "Esquire" hosiery in any manner that it might choose, and defendant threatening suit if any action by plaintiff should, in its opinion, violate the agreement.

Since 1941, Montgomery, Ward & Co., a large mail order house, has taken about one-third of plaintiff's entire output of men's seamless hosiery. It listed the hosiery in its catalogue, having a circulation of about 5,000,000 copies yearly, under the name of "Esquire", and sold it in its retail stores.

In October 1942 plaintiff began to advertise "Esquire" hose in trade papers, the Post Exchange (a trade paper for U.S. Army Post Exchanges), and the New York Times Magazine, which had a weekly circulation of over 1,000,000 copies. The New York Times advertisements (3 in 1943 and 1944) were the only advertisements addressed to the consuming public until 1947. Plaintiff also made allowances to retailers, who applied them to the cost of their own advertisements of "Esquire" socks, but plaintiff exercised no supervision over the retailer advertisements, merely making suggestions. A few of plaintiff's early advertisements referred merely to "Esquire Men's Hose", or to "Esquire Hose", but most contained the Pickwickian character and the words "Nickels & Lauber, Inc., a division of Chester H. Roth Co., Inc."

After the merger of Nickels & Lauber (N.Y.) into plaintiff, in November 1946, plaintiff substituted for the words "Nickels & Lauber, Inc., a division of Chester H. Roth Co., Inc." the words "Esquire Socks division of Chester H. Roth Co., Inc.", and the Pickwickian character was dropped. Plaintiff then, in 1947, embarked upon an extensive nation-wide advertising campaign, expending over $500,000 in monthly full-page advertisements in Life, The Saturday Evening Post, and

several trade papers, in which the words "Esquire Socks, the smartest thing on two feet", were prominently displayed. This continued after this suit was instituted on January 21, 1947, until at least May 1948, shortly before the trial. Some of these advertisements did not show the name of the manufacturer of the socks; some, especially in the trade papers, gave the name of plaintiff or the Esquire Socks division of plaintiff.

In the meantime, plaintiff had written defendant on August 21, 1946:

"This is to notify you that we consider this agreement (of July 21, 1938) void, and that we will no longer operate thereunder or fulfill the same. It is our intention to use our registered trade-mark 'Esquire', free from the restrictions of the aforesaid agreement in toto. We shall be pleased to accept service."

■■ First.—As to the validity of the agreement of July 21, 1938.—This agreement was merely a re-writing of the earlier agreement of December 31, 1935, and it substituted Nickels & Lauber (N.Y.) as a party in place of Nickels & Lauber (Pa.), the original party. In general, the agreement (1) provided for concurrent use of the mark "Esquire" by both parties; (2) specified the particular uses to which the mark might be put by each party, and (3) provided for joint protection of the mark against infringement by outsiders. There was no lack of consideration for the agreement, as the covenants undertaken by the respective parties were mutual. And agreements for the joint and concurrent use of trade-marks have been upheld by the Federal Courts. Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co., 7 Cir., 63 F. 438; California Packing Corp. v. Sun-Maid Raisin Growers, 9 Cir., 81 F.2d 674, certiorari denied, Sun Maid Raisin Growers v. California Packing Corp., 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391, and California Fruit Growers Exchange v. Windsor Beverages, Ltd., 7 Cir., 118 F.2d 149.

■■ But it is contended by the plaintiff that the agreement is void for champerty and maintenance, and as being against public policy. Champerty and maintenance are defined in the Restatement of the Law of Contracts (§ 540(1)' (b) as follows:

"Maintenance means the maintaining, supporting or promoting of litigation of another.

"Champerty is the division of the proceeds of litigation between the owner of the litigated claim and a party supporting or enforcing the litigation." Here there is no champerty, for the agreement contains no provision giving the defendant any share in the proceeds of any litigation which Nickels & Lauber (N.Y.) might institute at the defendant's request and successfully prosecute. Neither is the agreement void for maintenance. Both parties had obtained federal registration of the "Esquire" mark, although applied to different kinds of merchandise. Other persons were commencing to use the mark in such manner as to trespass upon the rights of both parties. It was therefore to their mutual interest that the mark be protected from invasion, and the mere fact that one of the parties undertook to defray the expense of litigation in the joint interest of both was not "maintaining, supporting or promoting of litigation of another". Nor is the agreement contrary to public policy. I think, for these reasons, that the agreement is valid and binding on the parties.

The plaintiff, however, takes the position that it is at liberty to use the mark, without any restrictions, on women's hosiery and in the entire field of men's and women's haberdashery and wearing apparel. The difficulty with this contention is that by the very terms of the agreement the plaintiff is restricted in the use of the mark "solely and only in connection with men's hosiery, * * * men's knitted neckwear, men's scarfs and men's mufflers", and never to extend such use "to any other articles or business".

■ Second.—As to plaintiff's title to the trade-mark. It is the defendant's contention, on this branch of the case, that the sale to the plaintiff by the Mock Company on December 20, 1938, of the entire

capital stock of Nickels & Lauber (N.Y.) did not carry any rights under the trade-mark, because Nckels & Lauber (N.Y.) was not at the time a going concern. The facts already recited are a complete refutation of this contention. They plainly show that Nickels & Lauber (N.Y.) was actually in business, using the mark in the sale of full-fashioned socks, and had assets and a good-will. Furthermore, the transaction was merely a sale of the entire capital stock of Nickels & Lauber (N.Y.); it was in no sense a sale of the mark in gross. See Mutual Life Insurance Co. v. Menin, 2 Cir., 115 F.2d 975; American Broadcasting Co. v. Wahl Co., 2 Cir., 121 F.2d 412. The case of Reconstruction Finance Corp. y. J. G. Menihan Corp., D.C., W.D.,N.Y., 28 F.Supp. 920, cited by the defendant, is not at all analogous.

■ Third.—The question remains whether the plaintiff has breached the agreement (a) in changing from full-fashioned hosiery to seamless hosiery after 1940; (b) in discarding the Pickwickian character in its advertising and on its boxes and labels, and (c) in not using its "best" efforts to prevent any likelihood of confusion" between its products and the products or services of the defendant. With respect to the change to seamless hosiery, there is no prohibition whatever in the agreement against its doing so; and the plaintiff had a clear right to extend the use of the mark to "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 37. See also Standard Brands v. Eastern Shore Canning Co., 4 Cir., 172 F.2d 144, 146. The evidence relating to the Pickwickian character shows that its use was continued on the boxes and labels when they were re-designed by plaintiff in 1939 or 1940, and nothing appears in the record to indicate that any change was made after that time. However, after 1946 the use of the Pickwickian character in plaintiff's advertising was completely discarded. The agreement contains no provision whatever concerning the nature of the advertising to be done by the plaintiff, and I cannot see, therefore, how the failure of the plaintiff to use the Pickwickian character is of any importance, except possibly for its bearing on the question of confusion.

■ With respect to the charge of confusion, the defendant relies mainly on the discarding of the Pickwickian character, the omission in plaintiff's own advertising of the name of plaintiff as the manufacturer of the hosiery, and the asserted use of the word "Esquire" as plaintiff's corporate name. As to the discarding of the Pickwickian character, no more need be said other than that the character is not part of the registered trade-mark, and the agreement does not require its use in advertising. The omission in plaintiff's own advertising of the name of plaintiff as the manufacturer or distributor of the hosiery may have resulted in likelihood of confusion, but this is implicitly recognized in the agreement itself, and is insufficient to justify a judgment for defendant either for an injunction or for damages. S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427; s.c. upon subsequent appeal, decided June 2, 1949, 175 F.2d 176. See also Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, 973-974. The action, however, is for a declaratory judgment determining the rights of the parties in the use of the word "Esquire" as a trade-mark, and I think that under the agreement plaintiff should be required to indicate the source of the merchandise by showing its name as the manufacturer or distributor of the product in its own advertising.

■ The contention regarding the corporate name is directed to plaintiff's order blanks addressed solely to "Esquire Socks", to the use of the term "Esquire Socks division of" plaintiff, to the listing of "Esquire Socks" in the directory of the building in which plaintiff has its offices in New York, and to the use of the word "Esquire" in advertisements by retail stores. All that the agreement prohibits is the use by plaintiff of the word "Esquire" "as part of its corporate name". Here the corporate name of plaintiff is "Chester H. Roth Co., Inc.", and it surely needs no argument to prove that such incidental uses of the word "Esquire" have no relation to plaintiff's

corporate name. Furthermore, the plaintiff is not responsible for unauthorized advertising by retail stores.

There may be a judgment declaring that the agreement of July 21, 1938 is valid and binding on both plaintiff and defendant; declaring that plaintiff is entitled to use the word "Esquire" only in connection with men's hosiery, men's knitted neckwear, men's scarfs and men's mufflers; declaring that plaintiff indicate in its own advertising the source of the merchandise by showing its name as the manufacturer or distributor of the product; denying the relief sought by defendant for an injunction and damages; and awarding costs to plaintiff.